811 P.2d 356

**The STATE of Arizona, Appellee,**

v.

**Jacqueline GREENE, Appellant.**

**No. 2 CA–CR 89–0659.**

Court of Appeals of Arizona,
Division 2, Department B.

Jan. 31, 1991.

Petition and Cross-Petition for Review Denied June 4, 1991.

Grant Woods, The Atty. Gen. by Paul J. McMurdie and Janet Keating, Phoenix, for appellee.

Michael S. Mussman, Pima County Legal Defender by Kathleen C. DuBois, Tucson, for appellant.

## OPINION

FERNANDEZ, Chief Judge.

Jacqueline Greene appeals from her conviction on three counts of child abuse for which she was sentenced to three consecutive terms of 12 years, to be served in full. She raises a number of issues on appeal. We need address only one, however, finding that the evidence was insufficient to support the verdict.

On November 18, 1988, the police served a search warrant on appellant that had been obtained after a school health clerk and a school resource officer had questioned appellant's 11–year–old daughter about the conditions at her home. The evidence was that the house was extremely dirty. The police found rotting food in the refrigerator and in the oven and roaches and other insects in the kitchen cupboards. Debris and trash were found throughout the house. In the bedrooms clothing was found in piles on the floor. Dog feces and urine were found throughout the house, in at least one case, in a pile of clothing in a bedroom. As a result, the house had a foul odor. The furnace unit was new, but the gas had been turned off at the valve. The heater vent in the girls' bedroom was blocked with a board. The police took custody of appellant's three children, ages eight, nine, and 11 and placed them in foster care. A city building inspector was called to the house. He posted it as unsafe for occupancy until it was cleaned.

Appellant was indicted on three counts of child abuse for the period between October 1 and November 17, 1988 pursuant to A.R.S. § 13–3623(B)(1) and one count of possession of a narcotic drug for 208 milligrams of cocaine that were found in her purse during the search. The state also filed an allegation pursuant to A.R.S. § 13–604.01 of dangerous crimes against children. The drug possession count was dismissed after appellant's directed verdict motion was granted because the state failed to establish chain of custody of the drug.

On appeal appellant argues that 1) the prosecutor's misconduct in trying her on the drug possession charge knowing he could not prove chain of custody denied her due process, 2) A.R.S. § 13–3623(B) is void for vagueness, 3) the trial court erred in denying her motion for directed verdict, and 4) her 36–year flat time sentence constitutes cruel and unusual punishment.

## DENIAL OF DIRECTED VERDICT MOTION

At the close of the state's evidence appellant moved for a directed verdict, arguing that the state had failed to show either the requisite mental state of intentional or knowing or that there was a likelihood of death or serious physical injury.

The statute under which appellant was charged reads as follows:

Under circumstances likely to produce death or serious physical injury, any person who causes a child to suffer physical injury or, having the care or custody of such child, causes or permits the person or health of such child to be injured or causes or permits such child to be placed in a situation where its person or health is endangered is guilty of an offense as follows:

1. If done intentionally or knowingly, the offense is a class 2 felony and if the victim is under fifteen years of age it is punishable pursuant to § 13–604.01.

A.R.S. § 13–3623(B). "Serious physical injury" is defined as "physical injury which creates a reasonable risk of death, or which causes serious or permanent disfigurement, or serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb." A.R.S. § 13–3623(A)(3).

There was no testimony that any of the children had suffered an injury. Therefore, one of the elements of the crime the state was required to prove was that the situation in which appellant had placed them created circumstances *likely* to produce death or serious physical injury.

In addition to the evidence recited above, the state presented testimony that the police found three handguns during their search of the residence, a nine millimeter pistol found on a shelf in the master bed-

room closet, a .38 special in a dresser drawer, and a .22 caliber handgun in a travel bag on the floor. There was no evidence that any ammunition was found in the search. Although a police officer testified that the nine millimeter pistol was loaded, he acknowledged during cross-examination that the photograph of the gun taken during the search showed a bullet jammed in the action so that the gun could not be fired without some alteration. The police did not testify that the other two guns were loaded. It was one of those two that appellant's daughter testified her brother had found in a helmet on top of the fireplace mantel and pointed at their sister.

The school resource officer testified that the furnace was shut off in the house. The landlady testified that a new furnace had been installed in February 1988. The officer acknowledged on cross-examination that appellant had told him the furnace was off because she had smelled gas. He testified on redirect that she had told him she had not called the landlady to repair the furnace. There was testimony that the average high temperature the first 17 days of November 1988 was 70 degrees, and the average low was 51. Five of the seven days in the week preceding November 18 had a low temperature below 51 degrees, the coldest being 37 degrees. The officer testified that the fireplace was warm when the search warrant was served. Appellant's daughter testified that when it was cold, they would get an extra blanket or sleep by the fireplace. She also testified that they had a portable electric heater.

The daughter testified that they had two rabbits and four or five dogs. She testified that the rabbits stayed in her room at first without a cage, but later a cage was built for them. She also testified that the dogs were mostly outside, but they would get inside and would go to the bathroom anywhere they could find.

In addition, the daughter testified that she had seen her mother and other adults cook cocaine into rocks, and she described the process she had seen. She stated they would either sell it or smoke it. She testified that one day her brother had tasted cocaine. The mother had told him no when he had asked to taste it, but he obtained some, tasted it, and spit it out. The daughter testified that had occurred while they lived at another house, a time period outside the indictment.

The daughter also testified about an incident in which someone threw the top of a gas tank through a window and glass fell on a sleeping baby who was not injured. That incident occurred at her aunt's house. The daughter testified that a woman had angered some men who had retaliated after the woman ran into the aunt's house and that appellant had nothing to do with that incident. The child also testified about another incident at the aunt's house when someone shot at the door. She did not indicate whether appellant was even present at the time of that incident.

Finally, the daughter testified about an incident at the aunt's house when appellant and her boyfriend were fighting, and appellant threatened him with a butcher knife. The child testified that the other adults removed all the knives and other dangerous objects from appellant's and the boyfriend's reach. The daughter indicated no violence had been directed at her.

The building inspector testified that the house had been posted as unsafe to be occupied solely because the dog feces and urine rendered it unsanitary. The code sections under which he declared the house unfit for occupancy provide for posting, as he testified, "if any reason exists that makes a dwelling unsafe for the purpose for which it's being used," "if a condition exists that would be an attractive nuisance to inquisitive persons," and "if due to inadequate maintenance, an unsanitary condition exists that makes a building unfit for human habitation or could *possibly* cause sickness or disease." (Emphasis added.)

No doctor testified about the children's condition. There was no testimony that they suffered from any illness other than the school resource officer's testimony that the oldest daughter was very thin and had a runny nose, a cough, and a mild fever on November 17. Both the officer and the building inspector admitted that neither the

feces nor the spoiled food had been tested for the presence of disease or parasites. There was no testimony about the condition of the dogs.

We have not found any cases that discuss the element of "circumstances likely to produce death or serious physical injury" in child abuse cases. We do note, however, that in nearly all the cases cited by either party as well as the cases we have found, most defendants were charged and convicted under § 13–3623(C), "[u]nder circumstances other than those likely to produce death or serious physical injury." *State v. Albrecht,* 158 Ariz. 341, 762 P.2d 628 (App.1988) (child care provider spanked child with a belt causing bruises); *State v. Deskins,* 152 Ariz. 209, 731 P.2d 104 (App. 1986) (children kept barefoot and exposed to scrap lumber with protruding nails and to feces from animals that appeared to be diseased; children slept outside near leaking portable toilet); *State v. Cantua–Ramirez,* 149 Ariz. 377, 718 P.2d 1030 (App. 1986) (blow intended for mother hit two-month-old baby in face causing bruise); *State v. Davis,* 148 Ariz. 391, 714 P.2d 884 (App.1986) (child spanked with belt suffered injuries to eye and leg); *State v. deBoucher,* 135 Ariz. 220, 660 P.2d 471 (App.1982) (boarding school director withheld medicine from brain-damaged child and slapped another in the face causing her lip to bleed); *State v. Smith,* 130 Ariz. 74, 634 P.2d 1 (App.1981) (house filthy, unsanitary, and in shambles with spoiled food, flies, and dead roaches; children had previously been removed from home because of unsanitary conditions). In *State v. Van Winkle,* 149 Ariz. 469, 719 P.2d 1085 (App. 1986), the defendant was charged under § 13–3623(B) after he threw his 11–month-old daughter into the car while he was eluding the employee of a store from which he had shoplifted. The child suffered facial bruises and swelling. This court noted that if the child was not seriously injured as appellant claimed, the denial of his Rule 20 motion was harmless error because he was convicted on a lesser charge under § 13–3623(C).

In two cases § 13–3623(B) was the basis for the conviction. In *State v. Poehnelt,* 150 Ariz. 136, 722 P.2d 304 (App.1985), a mother and stepfather were convicted after the woman's nine-year-old daughter was found tied and gagged in a motel room. The child had bruises on her face, scars that were consistent with her testimony that she had been struck with pliers, two broken fingers caused by a hammer, and severe mental and emotional injuries. Most significantly, however, she was severely malnourished and had been starved for a period perhaps as long as five years so that her growth had been stunted. There was testimony not only from the treating physician but also from more than one expert on the battered child syndrome. In *State v. Tamplin,* 146 Ariz. 377, 706 P.2d 389 (App.1985), the defendant was apparently convicted under § 13–3623(B) of child abuse by criminal negligence, and the crime was found to be of a dangerous nature. The defendant had caused second-degree burns on a two-year-old boy by placing him in hot water.

■ In this case, there was no medical testimony nor any other expert testimony as to the likelihood that any of the children might suffer serious physical injury or death because of the conditions in the home. "A Rule 20 motion is designed to test the sufficiency of the state's evidence. If no substantial evidence exists that the defendant committed the crime, then the trial judge must enter a judgment of acquittal." *State v. Neal,* 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984).

The only reasonable inference that could be drawn from the evidence was that a *potential* for harm existed. We find it telling that both the presentence report and the trial court at sentencing implicitly acknowledged that. In the presentence report, the probation officer noted, "In aggravation, the Court may wish to consider the *potential* infliction of serious physical injury to the victims." (Emphasis added.) At sentencing, the court stated, "In aggravation, I would consider the *potential* for physical harm to the children." (Emphasis added.) In its brief, the state commits the same error. It argues, "While there was no test of the feces, urine, or food for

disease, expert testimony was not necessary for the jurors to determine that such conditions endangered the children with the *possibility* of death or serious physical injury." (Emphasis added.)

The statute, however, calls for circumstances "likely" to cause death or serious physical injury, not merely the possibility that they will. According to Webster's Third New International Dictionary 1310 (1971), "likely" means "of such a nature or so circumstanced as to make something probable." "Potential," on the other hand, is defined as "existing in possibility." *Id.* at 1775. The evidence the state presented was insufficient to establish the likelihood of harm; it was thus error to deny appellant's Rule 20 motion.

■ We conclude, however, that the evidence was sufficient to support appellant's conviction pursuant to § 13–3623(C)(1) under circumstances other than those likely to cause death or serious physical injury. *See State v. Hunter,* 102 Ariz. 472, 433 P.2d 22 (1967). Therefore, her convictions under that section are affirmed, and the case is remanded for resentencing accordingly.

ROLL, P.J., and HOWARD, J., concur.