987 P.2d 779

Derick MARTIN, Harold Ray, John Jones, George Milligan, Robert Arnold, John Turner, Danny Howland, Orton Innis, Harlan Dennis, James Nall, Jordan Madison; and Issachar Judah, Harry Gross, Petitioners,

v.

The Honorable Ronald S. REINSTEIN, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent,

and

The State of Arizona, Real Party in Interest.

No. 1 CA-SA 98-0260.

Court of Appeals of Arizona, Division 1, Department D.

May 13, 1999.

Review Denied Oct. 26, 1999.

Barbara L. Spencer and Jamie McAlister, Phoenix, Attorney for Petitioners

Richard M. Romley, Maricopa County Attorney by Patricia L. Howe, Deputy County Attorney and Joseph B. Heilman, Deputy county Attorney, Phoenix, Attorneys for Real Party in Interest

## OPINION

BERCH, Judge.

¶ 1 In this special action, Petitioners challenge the constitutionality of Arizona's Sexually Violent Persons Act, Arizona Revised Statutes Annotated ("A.R.S.") sections 36–3701 through –3716 (Supp.1998).[1] On October 14, 1998, we heard oral argument and issued an order accepting jurisdiction, denying relief, and indicating that an opinion would follow. This is that opinion.

## I. BACKGROUND

A. *Arizona's Sexually Violent Persons Act*

¶ 2 In 1995, the Arizona legislature determined that the public should be protected from persons who suffer from a mental disorder that makes them likely to commit violent sexual offenses; it further determined that such persons should be treated. In response to these concerns, the legislature passed the Sexually Violent Persons Act, which, in general terms, allows the State to confine persons who have previously been found guilty of violent sexual acts or have been charged

with such crimes but were deemed incompetent to stand trial for them, if those individuals also suffer from a "mental disorder" that makes them "likely to engage in acts of sexual violence" in the future. *See* A.R.S. § 36–3701(7)(b) (definitions). The legislature recognized that such individuals do not suffer from a usual mental illness or disease that would make them subject to civil commitment under Arizona's general mental health statutes and therefore created a new statutory scheme, the Sexually Violent Persons ("SVP") Act. The legislature's goal was to find a way to treat sexually violent persons and to protect the public from them until they are no longer dangerous to others.

*How the Act Operates*

¶ 3 Before a potential SVP is released from custody, the attorney general or county attorney may petition the court for a determination that probable cause exists to believe that the person is an SVP and requires continued treatment and detention for the protection of the public. *See* A.R.S. §§ 36–3704, 36–3705. If such an order issues, the SVP is detained in a secure facility. *See id.* § 36–3705(B). He[2] may request a hearing on the probable cause determination and, if that determination is affirmed, may request a jury trial. *See id.* §§ 36–3705(C), 36–3706. The Arizona Rules of Civil Procedure and Evidence apply to the proceedings. *See id.* § 36–3704(B).

¶ 4 During the process, the Act provides procedural safeguards closely paralleling those that apply in criminal cases; for example, an accused SVP is entitled to appropriate notices and hearings, a probable cause determination, appointed counsel, and a jury trial. *See id.* §§ 36–3704 to –3707. As in a criminal case, the prosecution must prove its case beyond a reasonable doubt. *See id.* § 36–3707(A).

¶ 5 If the accused is determined by the factfinder to be an SVP, the court may either

[1]. The Sexually Violent Persons Act was originally found at A.R.S. sections 13–4501 et seq. (Supp. 1995), then renumbered to sections 13–4601, et seq. (Supp.1996). It was amended during the 1998 legislative session and transferred from title 13, which deals generally with criminal law, to title 36, chapter 37, article 1, which deals with

mental health. *See* Sexually Violent Persons Act, 1998 Ariz. Sess. Laws 814. In this opinion, we will use the current citations.

[2]. Every petitioner in this case is a male.

(1) commit the SVP to the custody of the Department of Health Services, where he must be afforded "care, supervision or treatment until the person's mental disorder has so changed that the person would not be a threat to public safety if the person was conditionally released to a less restrictive alternative or was unconditionally discharged," *id.* § 36–3707(B)(1), or (2) "[o]rder that the person be released to a less restrictive alternative." *Id.* § 36–3707(B)(2). An SVP under the care of the Department of Health Services must be afforded treatment and must be examined at least annually to determine whether his mental disorder has sufficiently improved that he no longer poses a danger to the public. *See id.* § 36–3708. In addition, the SVP may petition annually for a change of status. *See id.* §§ 36–3709(B), 36–3714(B). The state bears the burden at each review to show, beyond a reasonable doubt, that continued commitment is necessary. *See id.* § 36–3714(C).

### *The Petitioners*

¶ 6 Petitioners are several persons against whom the state has filed SVP petitions. Although the underlying facts of each Petitioner's claim differ slightly from the facts relating to others' claims, all contend that the SVP Act is wholly unconstitutional, both on its face and as applied. We focus here only on the facial challenges and do not decide the challenges to the Act as applied to any individual Petitioner. We therefore do not recite the facts of each Petitioner's case.

### B. *Procedural History*

¶ 7 On January 12, 1998, the trial court heard oral argument on the issues raised in the petition. It denied Petitioners' requested relief. Petitioners filed a special action in the Arizona Supreme Court. Following oral argument, the court declined jurisdiction on March 18, 1998, with two Justices dissenting. The Supreme Court denied Petitioners' Motion for Reconsideration on April 21, 1998.

¶ 8 On September 18, 1998, Petitioners filed their special action in this court, seeking relief. We heard oral argument on October 14, 1998, and accepted jurisdiction.

### C. *Special Action Jurisdiction*

¶ 9 This Court has jurisdiction to hear and decide special actions and to grant relief. *See* A.R.S. § 12–120.21(A)(4) (1992); Ariz. R.P. Spec. Act. 1, 4; *Vo v. Superior Court,* 172 Ariz. 195, 198, 836 P.2d 408, 411 (App.1992). The exercise of special action jurisdiction is appropriate if a case raises issues of first impression or involves purely legal questions, questions of public importance, or issues that are likely to arise again. *See Andrade v. Superior Court,* 183 Ariz. 113, 115, 901 P.2d 461, 463 (App.1995). We generally accept special action jurisdiction "only in those cases in which 'justice cannot be satisfactorily obtained by other means,'" *Pompa v. Superior Court,* 187 Ariz. 531, 533, 931 P.2d 431, 433 (App.1997) (quoting *King v. Superior Court,* 138 Ariz. 147, 149, 673 P.2d 787, 789 (1983)), and may accept jurisdiction if doing so would conserve judicial resources. *See id.* All conditions are met here.

¶ 10 In this case, Petitioners are being held without bond in a maximum security wing of the Arizona State Hospital. They have no adequate remedy by appeal because there has been no final adjudication and other similarly situated inmates may be affected by the statute at issue here. *See State v. Superior Court,* 187 Ariz. 411, 414, 930 P.2d 488, 491 (App.1996). Respondents nonetheless urge us not to accept jurisdiction of the case because the legislature has amended the SVP law since the trial court's hearings in this matter, and by doing so has mooted some of the Petitioners' claims. Specifically, the legislature has substituted the rules of civil procedure for the rules of criminal procedure and has moved the SVP Act from Title 13, the title encompassing Arizona's criminal statutes, to Title 36, the title involving mental health. *See* footnote 1, *supra.* These changes, Respondents argue, resolve most of Petitioners' complaints because the changes are presumed to apply retroactively to cover Petitioners' claims. *See State v. Leonard,* 151 Ariz. 1, 4, 725 P.2d 493, 496 (App.1986) (procedural rules may apply retroactively unless retroactive application would impair vested rights); *Allen v. Fisher,* 118 Ariz. 95, 96, 574 P.2d 1314, 1315 (App. 1977) (same). Even if the changes do apply

retroactively, however, this case still raises constitutional issues of first impression and statewide importance and thus is appropriate for review. *See State v. Superior Court,* 187 Ariz. at 414, 930 P.2d at 491.

¶ 11 Respondents also urge us not to take the case because issues will remain to be litigated in the trial court. While it is true that the facts may differ among the Petitioners' cases, the underlying constitutionality of the Act must nonetheless be adjudicated before a trial court can determine whether any individual Petitioner is being or has been deprived of rights under the Act. As the number of Petitioners in this case indicates, several of these cases have been filed before the trial courts. Concern for those incarcerated, the risk of inconsistent adjudications, and the promotion of judicial economy motivate us to accept jurisdiction of this petition at this time.

¶ 12 This case also involves several claims regularly found to warrant review by special action: the denial of a motion to dismiss based on double jeopardy grounds and the denial of bond. *See Miller v. Superior Court,* 189 Ariz. 127, 129, 938 P.2d 1128, 1130 (App.1997) (double jeopardy); *Ferreira v. Superior Court,* 189 Ariz. 4, 6–7, 938 P.2d 53, 55–56 (App.1996) (double jeopardy); *Nalbandian v. Superior Court,* 163 Ariz. 126, 130, 786 P.2d 977, 981 (App.1989) (double jeopardy); *Davis v. Winkler,* 164 Ariz. 342, 345, 793 P.2d 99, 102 (App.1990) (denial of bond). If Petitioners are required to go through trial, they will have been twice placed in jeopardy if indeed the Act violates the Double Jeopardy Clause, and their arguments regarding availability of pretrial release or bond will be mooted. This case thus raises issues appropriate for disposition in a special action.

¶ 13 We conclude that review by special action is warranted, and, in the exercise of our discretion, we accept jurisdiction. *See Ban v. Quigley,* 168 Ariz. 196, 197, 812 P.2d 1014, 1015 (App.1990).

3. We note that the range of constitutional issues challenged in any one of these cases is not as

## II. CONSTITUTIONAL CHALLENGES

### A. *Introduction*

¶ 14 Petitioners challenge the constitutionality of Arizona's SVP Act on a number of grounds, alleging that it violates constitutional prohibitions against ex post facto laws and double jeopardy, denies equal protection and due process, impermissibly chills free speech, violates separation of powers, and is vague and overbroad.

¶ 15 The Arizona legislature did not create its SVP Act out of whole cloth. The Act is patterned after statutes in other jurisdictions, many of which have been reviewed by their respective state appellate courts and found to be constitutional.[3] *See In re Hay,* 263 Kan. 822, 953 P.2d 666 (1998); *In re Haga,* 87 Wash.App. 937, 943 P.2d 395 (1997); *Wisconsin v. Zanelli,* 212 Wis.2d 358, 569 N.W.2d 301 (1997); *Commonwealth v. Tate,* 424 Mass. 236, 675 N.E.2d 772 (1997), *cert. denied, sub nom. Tate v. Massachusetts,* 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 55 (1997); *Wisconsin v. Post,* 197 Wis.2d 279, 541 N.W.2d 115 (1995), *cert. denied sub nom. Post v. Wisconsin,* 521 U.S. 1118, 117 S.Ct. 2507, 138 L.Ed.2d 1011 (1997); *Wisconsin v. Carpenter,* 197 Wis.2d 252, 541 N.W.2d 105 (1995), *cert. denied sub nom. Schmidt v. Wisconsin,* 117 U.S. 2507, 117 S.Ct. 2507, 138 L.Ed.2d 1011 (1997); *In re Linehan,* 557 N.W.2d 171 (Minn.1996), *cert. granted,* 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997) (vacated and remanded for reconsideration in light of *Kansas v. Hendricks* ). Most notably, the United States Supreme Court recently upheld the Kansas SVP Act—an act much like Arizona's. *See Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

¶ 16 A statute's constitutionality is a matter of law, analyzed *de novo* by this court. *See Arizona Dep't of Pub. Safety v. Superior Court,* 190 Ariz. 490, 494, 949 P.2d 983, 987 (App.1997). We begin with a strong presumption that laws are constitutional. *See Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 148, 800 P.2d 1251, 1256 (1990); *State v. Tocco,* 156 Ariz. 116, 119, 750

broad as the range of constitutional issues raised by Petitioners here.

P.2d 874, 877 (1988); *State v. McDonald,* 191 Ariz. 118, 120, 952 P.2d 1188, 1190 (App. 1998). Indeed we have a duty to construe statutes in harmony with the constitution if it is possible to reasonably do so. *See Baker v. Superior Court,* 190 Ariz. 336, 341, 947 P.2d 910, 915 (App.1997). Thus, a party challenging constitutionality bears a heavy burden of establishing that the legislation is unconstitutional.[4] *See Chevron Chemical Co. v. Superior Court,* 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982); *Arizona Dep't of Pub. Safety,* 190 Ariz. at 494, 949 P.2d at 987 (citing *McClead v. Pima County,* 174 Ariz. 348, 352, 849 P.2d 1378, 1382 (App.1992)).

■ ¶ 17 In addition to their claims under the federal constitution, Petitioners challenge the Act under several provisions of the Arizona Constitution. Although Arizona courts recognize the desirability of uniform interpretation, *see Pool v. Superior Court,* 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984), they have "rejected the so-called lock-step approach, which requires the state to unquestioningly adopt federal construction" of parallel state constitutional provisions. Stanley G. Feldman and David L. Abney, *The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution,* 20 Ariz. St. L.J. 115, 144 (1988).[5] This court need not blindly follow federal precedent "just because it has 'become so firmly embedded' that it is the standard." *Id.* (citing *Sanders v. Mississippi,* 429 So.2d 245, 251 (Miss.1983)).

¶ 18 Although Arizona's constitutional provisions usually are interpreted to be the same as their federal counterparts, they have been construed to afford greater protection than do the federal provisions in areas such as religion,[6] double jeopardy,[7] and jury trials.[8] One question before us is whether it provides greater protection than does the federal constitution in the areas at issue in this appeal.

## B. *Civil Versus Criminal Consequences*

■ ¶ 19 Among other challenges, Petitioners claim that the SVP Act violates their right not to be twice placed in jeopardy or subjected to ex post facto laws, and their right to release on bond. These constitutional guarantees, however, apply only in the criminal context. Thus if the act is civil and regulatory, not criminal or punitive, these guarantees do not apply. *See Hendricks,* 521 U.S. at 346, 117 S.Ct. 2072; *Arizona Dep't of Pub. Safety,* 190 Ariz. at 499, 949 P.2d at 992. For that reason, we first inquire into the nature of the Act.

¶ 20 Following the reasoning of the United States Supreme Court in *Hendricks,* the trial court held that Arizona's Act was "a regulatory act for the treatment of respondents and for the protection of the community"—that is, the court found the Act civil, not criminal, in nature. We agree.

■ ¶ 21 The language and the effect of the Act and the legislature's intent determine whether the Act is civil or criminal. *See Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072; *State v. Noble,* 171 Ariz. 171, 175, 829 P.2d 1217, 1221 (1992); *Arizona Dep't of Pub. Safety,* 190 Ariz. at 495, 949 P.2d at 988. Although Arizona's SVP Act is found in Title 36 of the statutes, the title relating to civil health issues, nowhere in the SVP Act or the statement of legislative intent prefacing it

---

4. A different standard applies in the analysis of statutes alleged to infringe free speech rights, *see infra* Section II(H), ¶¶ 95–103.

5. *See also* Paul Marcus, *State Constitutional Protection for Defendants in Criminal Prosecutions,* 20 Ariz. St. L.J. 151, 178 (1988) (recommending analysis of state constitutional provisions); Hans A. Linde, *E Pluribus–Constitutional Theory and State Courts,* 18 Ga. L.Rev. 165, 178 (1984) (suggesting approaches to applying state constitutional provisions); Hans A. Linde, *First Things First: Rediscovering the States' Bill of Rights,* 9 U. Balt. L.Rev. 379, 380 (1980).

6. *See* Feldman, *supra,* at 143.

7. *See Pool,* 139 Ariz. at 108–09, 677 P.2d at 271–72 (barring retrial if prosecutor's intentional misconduct causes prejudice to the defendant, which cannot be cured other than by the declaration of a mistrial). Although Arizona was in the forefront in this area, the federal interpretation now is virtually identical to that adopted in *Pool.*

8. *State ex rel. McDougall v. Strohson (Cantrell),* 190 Ariz. 120, 121–22, 945 P.2d 1251, 1252–53 (1997) (Arizona Constitution provides greater access to jury trials than is required by the federal constitution).

does the legislature state explicitly whether the Act is civil or criminal.[9] Even had it done so, however, the label would not be dispositive:

> Although we recognize that a "civil label is not always dispositive," ... we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the legislature's] intention" to deem it "civil."

*Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072 (quoting *Allen v. Illinois*, 478 U.S. 364, 369, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986); *United States v. Ward*, 448 U.S. 242, 248–49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)); *see also San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, ¶ 14, 972 P.2d 179 (1999) (although declaration of intent may be helpful in interpretation, text of measure is most reliable guide). In addition to the statement of legislative intent, several factors demonstrate the Act's civil nature: (1) the legislature's focus on treatment of SVPs and protection of the public, (2) the decisions to apply the rules of civil procedure to the proceedings and to apply procedural protections—such as the right to appointed counsel and proof beyond a reasonable doubt—and (3) the decision to move the Act from title 13 of the Arizona Statutes to title 36, the title relating to civil commitment. *See* 1995 Ariz. Sess. Laws 2007, 2016 § 10(3); A.R.S. §§ 36–3701 to—3713. Thus the legislative intent and the language and title of the Act demonstrate that it was intended to be civil, not criminal.

¶ 22 Nonetheless, even the legislature's intent to create a civil system can-

not control if the statutory scheme is so "punitive either in purpose or effect" that it cannot be considered civil. *See Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072 (citing *Ward*, 448 U.S. at 248–49, 100 S.Ct. 2636); *Noble*, 171 Ariz. at 175, 829 P.2d at 1221. Our supreme court has determined that the factors set forth in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), should be applied to assist in determining whether a sanction is punitive or regulatory. *See Noble*, 171 Ariz. at 175, 829 P.2d at 1221.[10] Those factors include (1) whether the statute imposes an affirmative disability or restraint; (2) whether the affirmative restraint has historically been regarded as punishment; (3) whether the statute accomplishes the traditional goals of punishment, such as retribution or deterrence; (4) whether there are other, nonpunitive purposes of the statute, such as treatment of the person charged or protection of the public; and (5) whether the restraint resulting from the application of the statute is excessive in relation to the nonpunitive purposes. *See id.* at 175–78, 829 P.2d at 1221–24 (applying *Kennedy* factors); *see also Hendricks*, 521 U.S. at 361–63, 117 S.Ct. 2072. The factors are neither exhaustive nor dispositive, but provide a useful framework for analyzing this issue. *See Ward*, 448 U.S. at 249, 100 S.Ct. 2636; *Arizona Dep't of Pub. Safety*, 190 Ariz. at 496, 949 P.2d at 989.

¶ 23 The first factor, whether the statute imposes an affirmative disability or restraint, must be answered affirmatively. One subject to the Act who is found to suffer from a mental disorder and to be dangerous

---

9. We recognize that legislators may draft statements of legislative intent to influence later interpretations of the statutes; nonetheless, such statements do provide some guidance. *See generally* Note, *Why Learned Hand Would Never Consult Legislative History Today*, 105 Harv. L.Rev. 1005, 1019 (1992) (legislative intent is difficult to ascertain and legislative history may be indeterminate).

10. Later cases in the federal system have limited the application of the *Kennedy* factors to those cases determining the nature of the proceeding— that is, whether an action is civil or criminal— not to those determining the nature of the pun-

ishment. *See, e.g., Austin v. United States*, 509 U.S. 602, 610 n. 6, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). According to one commentator, the civil/criminal distinction sufficiently differs from the regulatory/punitive inquiry that the *Kennedy* factors should apply only in making the civil/criminal distinction. *See* Note, *Prevention Versus Punishment: Toward a Principled Distinction in the Restraint of Released Sex Offenders*, 109 Harv. L.Rev. 1711, 1721 and n. 90 (1996). Although our purpose is to determine whether the act is civil or criminal in nature, we find the factors useful, and their application commanded by our supreme court.

to others will be detained in a secure facility unless released to a less restrictive alternative placement. Any confinement, however, is to allow treatment and to protect the public, not to punish for past crimes. Detention, standing alone, does not render the Act punitive, for those confined under Arizona's SVP law are subject to conditions generally equivalent to those to which individuals committed under the general mental health involuntary commitment law are subject. *See Hendricks,* 521 U.S. at 361–62, 117 S.Ct. 2072 (finding same regarding Kansas SVP law and further noting that Kansas' conditions of confinement did not suggest a punitive purpose). Although one purpose of the confinement is to deter future acts of misconduct, a traditional criminal goal, treatment demonstrates a civil purpose.

¶ 24 Petitioners challenge as punitive the length of the confinement, which they view as "indefinite." The United States Supreme Court rejected a similar argument in *Hendricks,* 521 U.S. at 363, 117 S.Ct. 2072 as did the Washington Supreme Court in *In re Young,* 122 Wash.2d 1, 857 P.2d 989, 1007 (1993), and the Wisconsin Supreme Court in *Post,* 541 N.W.2d at 127–32. Although the commitment is uncertain in duration, the Supreme Court found the commitment not punitive, but rather tied to the SVP's mental condition. *See Hendricks,* 521 U.S. at 363, 117 S.Ct. 2072. Like Arizona's Act, the Kansas law at issue in *Hendricks* requires commitment "until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." *Compare* 521 U.S. at 353, 117 S.Ct. 2072 (quoting Kan. Stat. Ann. § 59–29a07(a)) *with* A.R.S. § 36–3707(B)(1). Moreover, the Arizona Act allows release to a less restrictive alternative or even total discharge, *see* A.R.S. section 36–3707, should either option become appropriate. One sub-

ject to the Act must be examined at least annually, *see id.* section 36–3708, and may petition the court for release annually, *see id.* section 36–3709, each time requiring the State to prove, beyond a reasonable doubt, that the individual continues to suffer from a mental disorder, "remains a danger to others and is likely to engage in acts of sexual violence if conditionally released to a less restrictive alternative or unconditionally discharged." *Id.* § 36–3709(A). These conditions and others satisfied the United States Supreme Court that the Kansas SVP Act was not excessively punitive. *See Hendricks,* 521 U.S. at 352–53, 369, 117 S.Ct. 2072. Those same conditions support the majority here in holding the same regarding the Arizona Act.[11] Mere uncertainty as to the term of commitment does not render the commitment punitive.

¶ 25 The second factor, whether the restraint or commitment has traditionally been regarded as punishment, militates in favor of finding the Act civil in nature. Although incarceration has long been a traditional criminal punishment, commitment for treatment has been considered a civil solution to the difficult problems surrounding mental health treatment. *See, e.g., Allen,* 478 U.S. at 369, 106 S.Ct. 2988 (holding Illinois statute providing for commitment of sexually dangerous persons civil, not criminal).

¶ 26 Civil commitment to treat mental health problems has a long history. Restricting our review to the twentieth century, we note that in the 1930s, in an effort to treat recidivist sexual offenders rather than simply punishing them criminally, many states passed civil commitment statutes known as "sexual psychopath laws."[12] *See generally* Racquel Blacher, Comment, *Historical Perspective of the "Sex Psychopath" Statute: From the Revolutionary Era to the*

---

**11.** Challenges to "indefinite" confinement have also been rejected in the civil contempt area. See cases cited at 17 C.J.S. *Contempt* § 93 (1963) ("Imprisonment for civil contempt usually is not for a definite term, but the party in contempt stands committed unless and until he performs the affirmative act required by the order of the court." (citations omitted)) and (Supp.1998) ("Court not precluded from exercising coercive civil powers of unlimited incarceration").

**12.** The Supreme Court upheld such statutes against substantive due process, equal protection, double jeopardy, ex post facto, and self-incrimination challenges. *See* V. Woerner, Annotation, Statutes Relating to Sexual Psychopaths, 24 A.L.R.2d 350, 352, 354–64 (1952).

*Present Federal Crime Bill*, 46 Mercer L.Rev. 889, 897–98 (1995); *see also Minnesota ex rel. Pearson v. Probate Court*, 309 U.S. 270, 274, 60 S.Ct. 523, 84 L.Ed. 744 (1940) (upholding Minnesota sexual "psychopathic personality" law). The objectives of such statutes, like those underlying the SVP statute at issue here, were "(1) to protect society by sequestering the sexual psychopath so long as he remains a menace to others, and (2) to subject him to treatment to the end that he might recover from his psychopathic condition and be rehabilitated." V. Woerner, Annotation, Statutes Relating to Sexual Psychopaths, 24 A.L.R.2d 350, 351 (1952). In upholding sexual psychopath laws against constitutional challenge, the United States Supreme Court rejected the claim that such laws were criminal in nature. *See, e.g., Allen*, 478 U.S. at 374, 106 S.Ct. 2988; *Probate Court*, 309 U.S at 270, 60 S.Ct. 523; *see also* Woerner, *supra*, at 352–54 and cases cited therein.

¶ 27 Approximately half the states that had enacted such statutes had repealed them by 1990 as part of a trend to punish rather than to treat offenders. *See Blacher, supra*, at 906–07. The enactment of SVP laws such as Arizona's thus is not novel, but represents a return to civil treatment and specific deterrence rather than punishment of sex offenders. The Arizona legislature recognized the inadequacy of the definition of mental illness or abnormality in the civil involuntary commitment procedures to cover those likely to commit violent sexual offenses and has created a commitment procedure to fill that interstice.

¶ 28 In this case, the trial court thoughtfully considered the treatment required by the Arizona Act:

Arizona has gone far beyond Kansas in the way of treatment plans, as noted by the fact that there has been evidence presented to the Court that the Arizona State Hospital has contracted with one of the leading experts in sex offender treatment, Dr. Judith Becker of the University of Arizona, to set up a treatment program for those adjudicated as sexually violent persons and facilities are being reconstructed to house those who are deemed to be

sexually violent persons. This seems far more than what the State of Kansas had provided Mr. Hendricks who seemingly was housed in a separate wing of the prison. The U.S. Supreme Court noted at p.2085 that "it must be remembered that he was the first person committed under the Act. That the State did not have all of its treatment procedures in place is not surprising." Similarly, [Petitioners] are the first persons who the State has petitioned under the Arizona Sexually Violent Persons Statutes.

We agree that the Arizona Act's focus on treatment rather than deterrence militates in favor of finding the Act civil in nature.

¶ 29 The third factor is whether the statute serves the traditional objectives of criminal punishment: retribution and deterrence. *See Noble*, 171 Ariz. at 177, 829 P.2d at 1223. If the Act has no remedial purpose, but serves only to deter or punish, it is criminal in nature. *See Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 777, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). We do not review whether a sanction constitutes punishment from the offender's perspective, "as even remedial sanctions carry the 'sting of punishment.'" *Id.* at 777 n. 14, 114 S.Ct. 1937 (quoting *United States v. Halper*, 490 U.S. 435, 447, n. 7, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)).

¶ 30 Respondents maintain that the Act cannot serve to deter others, since persons with personality disorders or certain types of compulsions are unlikely to be deterred by the threat of confinement. The United States Supreme Court agreed with this reasoning. *See Hendricks*, 521 U.S. at 362–63, 117 S.Ct. 2072. Although confinement will deter the individual SVP, we agree that the Act may not serve the goal of general deterrence.

¶ 31 As for retribution, in analyzing the Kansas SVP law, the United States Supreme Court found the Kansas law not retributive because it did not punish prior criminal conduct, but rather used the prior criminal charge solely for evidentiary purposes. *See id.* at 362, 370, 117 S.Ct. 2072. Arizona's SVP Act is the same in this respect. *See* A.R.S. § 36–3704(B). In addition, the Kan-

sas law did not make the criminal conviction a prerequisite for commitment. *See Hendricks,* 521 U.S. at 362, 117 S.Ct. 2072. Nor does Arizona's law. *See* A.R.S. § 36–3701(7)(a) (Act applies to those charged with a sexually violent offense but incompetent to stand trial). The Kansas law also lacked a scienter requirement, an element of criminal culpability. Arizona's law is similar in all respects and, therefore, under the Supreme Court's analysis, is also not retributive. Because of the Act's focus on protection of the public and treatment and not punishment for past crimes, we find the Act not retributive.

¶ 32 The fourth factor—whether the statute has other, non-punitive purposes—also supports the conclusion that the Act is civil in nature. Arizona's SVP Act serves two purposes: protection of the public from sexually violent persons, and treatment of those persons so that they may return to society. *See* Laws 1995, 2007 § 10(3); *see also Hendricks,* 521 U.S. at 351, 117 S.Ct. 2072; *Post,* 541 N.W.2d at 132. Neither purpose is punitive, although the effect of commitment to a Department of Health Services ("DHS") facility is to restrain freedom.

¶ 33 The fifth and final factor in determining whether the Act is civil or criminal in nature is whether the restraint resulting from the application of the statute is excessive in relation to the non-punitive purposes of the Act. *See Noble,* 171 Ariz. at 177–78, 829 P.2d at 1223–24 (citing *Kennedy* factors). Because we have found persuasive the evidence that the legislature's principal purposes were non-punitive, Petitioners bear a " 'heavy burden' of proof, which may be sustained only by 'the clearest proof' " that the restraint required is excessive in relation to the government's goals of treating SVPs and protecting the public. *Arizona Dep't of Pub. Safety,* 190 Ariz. at 496, 949 P.2d at 989 (citing *Hendricks,* 521 U.S. at 361), 117 S.Ct. 2072; *see also Linehan,* 557 N.W.2d at 187 (quoting *Ward,* 448 U.S. at 249), 100 S.Ct. 2636.

¶ 34 The answer to this question may become known only after-the-fact, by examining individual cases, because the practical effect of the application of Arizona's SVP law may, in some cases, be confinement for life.[13] On the other hand, the Act allows release to a less restrictive alternative placement or even total discharge at any time if the mental disorder no longer causes the SVP to be a danger to others. *See* A.R.S. § 36–3707(B)(1); *see also Hendricks,* 521 U.S. at 353, 117 S.Ct. 2072; *Post,* 541 N.W.2d at 132–33 (analyzing Wisconsin's SVP Act). The length of confinement is tied to and depends upon the improvement in the SVP's mental condition. According to Justice Kennedy, a critical inquiry in determining whether an act is excessively punitive is whether the possibility of continued confinement truly serves non-punitive purposes or whether it is a pretext for imposing additional "punishment after the State makes an improvident plea bargain." *See Hendricks,* 521 U.S. at 373, 117 S.Ct. 2072 (Kennedy, J., concurring). Because the Kansas Act provided for treatment, Justice Kennedy agreed with the majority that the Act was not excessively punitive.

¶ 35 The four-member dissent in *Kansas v. Hendricks* believed the Kansas Act to be excessively punitive because it failed to offer treatment and did not provide alternatives less restrictive than full custodial commitment. The majority in *Hendricks,* however, found that even the minimal treatment suggested in the Kansas statute rendered the Kansas Act non-punitive. *See Hendricks,* 521 U.S. at 367–68, 117 S.Ct. 2072. The trial court here found, and an examination of Arizona's Act supports, that Arizona's legislature has included and required far more treatment than did the Kansas legislature. For example, the Act mandates that one found to be an SVP "shall receive care, supervision, or treatment." A.R.S. §§ 36–3707(B), 36–3712(B). The SVP is housed "in the state hospital or a licensed behavioral health or mental health inpatient treatment facility,"[14] not in a jail or prison. *See id.*

---

13. This after-the-fact determination can be made only in a challenge to the law as applied to an individual. In this special action, we consider only facial challenges to the Act.

14. Citing A.R.S. § 13–4604(G) (Supp.1997), Petitioners argue that the statutes required transportation to an "appropriate facility," a term they argue is unclear. We do not address this argu-

§ 36–3707(B) (amended 1998). The Act mandates that those responsible for treating SVPs are required to keep detailed records of the treatment. *See id.* § 36–3712(B). Moreover, the state has hired an expert to set up Arizona's treatment program. Finally, Arizona's Act does provide for alternatives less restrictive than full custodial detention. Thus, the concerns regarding treatment and alternative placements that motivated four justices to dissent in *Hendricks* are satisfied in Arizona's Act.

¶ 36 Based on the foregoing factors, we conclude that the Arizona SVP Act's focus on treatment for SVPs and protection of the public rather than upon punishment and retribution renders it "civil" for purposes of our analysis. *See Hendricks,* 521 U.S. at 361–69, 117 S.Ct. 2072; *Noble,* 171 Ariz. at 175–78, 829 P.2d at 1221–24.

### C. *Double Jeopardy*

█ ¶ 37 The constitutional protections from double jeopardy prevent any person from being punished or put in jeopardy more than once for a criminal offense. *See* U.S. Const. amend. V; Ariz. Const. art. 2, § 10; *see also Halper,* 490 U.S. at 436, 109 S.Ct. 1892; *Pool,* 139 Ariz. at 108, 677 P.2d at 271. Petitioners argue that Arizona's SVP Act subjects them to multiple punishments for the same underlying offense.

¶ 38 We have determined that Arizona's SVP Act is civil, not criminal in nature and that confinement pursuant to it is for treatment and protection of the public, not punishment. Because the commitment is civil, it is not a second punishment, and the proceedings pursuant to the Act are not a second prosecution. *See Hendricks,* 521 U.S. at 369, 117 S.Ct. 2072; *Linehan,* 557 N.W.2d at 188; *Carpenter,* 541 N.W.2d at 107, 114.

¶ 39 The Supreme Court has stated that a civil commitment may follow a term of incarceration for a crime without offending double jeopardy principles. *See Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), *quoted in Hendricks,* 521 U.S. at 369, 117 S.Ct. 2072. Since we have

determined that commitment under Arizona's SVP Act is civil, double jeopardy principles are not violated.

¶ 40 The Arizona Constitution did at one time provide greater protection against double jeopardy than was provided by the federal constitution. *See Pool,* 139 Ariz. at 108–09, 677 P.2d at 271–72. *Pool* discusses the policies supporting Arizona's broader constitutional protection, all of which relate to a prosecutor's intentional misconduct, and none of which bears on the issue before us or compels the conclusion that the Arizona Constitution should be construed to provide greater protection than does the federal constitution in this instance. We thus conclude that Arizona's SVP Act violates neither the Arizona Double Jeopardy Clause nor its federal counterpart.

### D. *Ex Post Facto*

█ ¶ 41 The Ex Post Facto Clauses of the Arizona and federal constitutions prohibit laws that increase the punishment for a crime from that allowed when the crime was committed. *See* U.S. Const. art. I, § 9, cl. 3; Ariz. Const. art. 2, § 25; *see also Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798), *cited in Noble,* 171 Ariz. at 173, 829 P.2d at 1219. Like the Double Jeopardy Clause, the Ex Post Facto Clause pertains only to penal statutes. *California Dep't of Corrections v. Morales,* 514 U.S. 499, 505, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Because the Act is civil, not penal, it cannot be an ex post facto law.

¶ 42 As the trial judge succinctly explained,

> [Arizona's Sexually Violent Persons Act] is not an ex post facto law. Its focus is on [Petitioners'] *current* mental condition and the *present* danger to the community, *not* punishment.

We agree. Petitioners are not being additionally punished for their original crimes. *See Arizona Dep't of Pub. Safety,* 190 Ariz.

---

ment because that statute has been changed to require detention "in a licensed facility under the supervision of the superintendent of the Arizona state hospital," A.R.S. § 36–3705(B) (amended 1998), a description that we deem clear.

at 494, 949 P.2d at 987; *State v. Yellowmexican*, 142 Ariz. 205, 207, 688 P.2d 1097, 1099 (App.1984), *adopted and approved*, 142 Ariz. 91, 688 P.2d 983 (1984). Sentences on the underlying offenses are completed, or nearly so, and cannot be increased. Instead, it is the trial court's finding that probable cause exists to believe that Petitioners continue to be sexually violent individuals that triggers further detention for treatment of the person and protection of the public.

¶ 43 Petitioners have not argued that the language of Arizona's ex post facto provision or the case law interpreting it compels a result that differs from the result under the federal constitution. And indeed our review shows that the analysis of the Ex Post Facto Clauses of the federal and state constitutions is the same. *See Noble*, 171 Ariz. at 173 n. 4, 829 P.2d at 1219 n. 4.

¶ 44 Thus, because the SVP Act provides a civil deterrent and does not punish Petitioners for acts previously committed, criminalize conduct that was legal before its enactment, or deprive Petitioners of any defenses that were available to them at the time of their crimes, it is not an ex post facto law and the Arizona and federal ex post facto prohibitions do not apply.

### E. *Availability of Bond*

¶ 45 Petitioners assert that the Act denies them the right to post bond. The Arizona Constitution provides that "all persons charged with a crime shall be bailable." Art. 2, § 22. That constitutional provision is implemented by Rule 7.2 of the Arizona Rules of Criminal Procedure, which requires that any person "charged with an offense bailable as a matter of right shall be released pending or during trial" on the least onerous conditions that will reasonably assure the person's appearance. The Eighth Amendment to the federal constitution prohibits governmental demands for excessive bail, a prohibition that assumes a right to bail.

¶ 46 It is true that the SVP Act requires that the accused SVP be detained and does not provide for release on bond or bail. *See* A.R.S. § 36–3704 et seq. Those charged under the SVP Act, however, are charged civilly. See *supra* Section IIB, ¶¶ 19–36. They

are not charged with a crime, and therefore these constitutional provisions afford them no protection. *See Rasmus v. State*, 939 F.Supp. 709, 719 (D.Ariz.1996) (holding that article 2, section 22 of the Arizona Constitution does not apply to school district's short confinement of student in windowless "time out" room because there is no right to bail in civil cases).

¶ 47 The Arizona legislators may have reasoned that to release Petitioners on bond once probable cause has been found to believe they are sexually violent persons who pose a danger to others would defeat one of the two main purposes of the act: protection of the public. Instead of bond, the Act substitutes other protections for Petitioners, such as commitment only after a judge determines that there is probable cause to believe that the person suffers from a mental disorder that makes him a threat to public safety. *See* A.R.S. § 36–3705. The probable cause petition is filed before the accused SVP's release from confinement. *See id.* § 36–3704(A). If the judge finds probable cause, the person must be provided immediate notice, *see id.* § 36–3705(D), and may request a hearing. *See id.* § 36–3705(C). The expedited probable cause procedure should be accomplished by the release date. In addition, the Act applies only to a "small, but extremely dangerous group of sexually violent predators," *see* 1995 Ariz. Sess. Laws 2007, 2016 § 10(3), who have been charged with or convicted of any of a number of specified dangerous sex offenses and thus have demonstrated that they can pose a threat to the public. Petitioners suggest that an individualized determination of the appropriateness of bond is a better way to balance the public's and Petitioners' interests. That argument, however, is more appropriately directed to the legislature than to the courts. We cannot say that the legislature's determination is unconstitutional.

¶ 48 Petitioners also urge their entitlement to bond because one provision of the Act in effect when Petitioners filed this action stated that "all constitutional rights available to criminal defendants except the right not to be tried while incompetent ...

apply to the hearing conducted pursuant to this subsection." A.R.S. § 13–4606(D) (Supp.1996). Petitioners attempt to stretch this provision beyond recognition. Put in context, it applied [15] only to the trial itself and, more specifically, only to those Petitioners found incompetent to stand trial on the sexually violent act that serves as the predicate for the SVP petition. The provision attempted to ensure that persons who had not been convicted of a sexually violent act were afforded constitutional protections in the determination of whether they ever actually committed a predicate act. It does not afford protection to all Petitioners, and provides no protections outside the hearing itself. It does not afford a right to pretrial release on bond.

### F. *Equal Protection*

■ ¶ 49 The state and federal equal protection guarantees are designed to secure equal opportunity for those who are similarly situated. *See* U.S. Const. amend. XIV, § 1; Ariz. Const. art. 2, § 13; *see also Baxstrom*, 383 U.S. at 111, 86 S.Ct. 760; *State v. Walton*, 133 Ariz. 282, 288, 650 P.2d 1264, 1270 (App.1982); *State v. Beckerman*, 168 Ariz. 451, 453, 814 P.2d 1388, 1390 (App.1991). Petitioners claim that their right to equal protection of the law is violated because they are treated differently under the SVP Act from those committed under the civil involuntary commitment statutes.

■ ¶ 50 The equal protection provisions do not prohibit all classifications, but require that classifications be "predicated on some reasonable basis which will promote a legitimate purpose of legislation." *Chevron*, 131 Ariz. at 441, 641 P.2d at 1285 (quoting *Prescott Courier, Inc. v. Moore*, 35 Ariz. 26, 33, 274 P. 163, 165 (1929)).

> All discrimination or inequality is not forbidden. * * * [A] statute may be allowed to operate unequally between classes if it operates uniformly upon all members of a class, provided the classification is founded upon reason and is not whimsical, capricious, or arbitrary. [Citations omitted.]

Thus, both classification and discrimination may be made in a law, provided the discrimination or distinction has a reasonable foundation or rational basis and is not entirely arbitrary. * * * Inequality, to have the effect of invalidating a law, "must be arbitrary, unreasonable, oppressive, and not properly within the wide field of choice allowed to the legislature.* * * " *Valley Nat'l Bank v. Glover*, 62 Ariz. 538, 555, 159 P.2d 292, 299 (1945).

*Schecter v. Killingsworth*, 93 Ariz. 273, 281, 380 P.2d 136, 141 (1963). Equal protection analysis requires that we determine whether Petitioners are situated similarly to those with whom they claim the right to equal treatment, those subject to the civil commitment statutes. Before making this determination, we must ascertain the legal standard under which we must scrutinize the legitimacy of the legislature's classification.

■ ¶ 51 Petitioners assert that we must review the classification under a strict scrutiny review, not the deferential rational basis standard, because their liberty interests are at stake, and liberty is a fundamental right. *See Beckerman*, 168 Ariz. at 453, 814 P.2d at 1390 (fundamental rights reviewed under strict scrutiny test); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 114 n. 6, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996); *Kenyon v. Hammer*, 142 Ariz. 69, 78–79, 688 P.2d 961, 970–71 (1984) (identifying three levels of scrutiny). Under the strict scrutiny analysis, proponents of a law bear the burden of showing that it furthers a compelling state interest, that it is narrowly drawn to serve that interest, and that the state's interests outweigh Petitioners' fundamental liberty interests. *See M.L.B.*, 519 U.S. at 114 n. 6, 117 S.Ct. 555; *Kenyon*, 142 Ariz. at 78–79, 688 P.2d at 970–71. The presumption of constitutionality of laws vanishes. *See Maricopa County Juv. Action No. JT9065297*, 181 Ariz. 69, 78, 887 P.2d 599, 608 (App.1994).

■ ¶ 52 Respondents, on the other hand, contend that the deferential "rational basis" test should apply. Rational basis re-

---

**15.** The provision no longer appears in the statute.

view imposes on Petitioners, as the parties challenging the constitutionality of the Act, the burden of establishing that the law is unconstitutional by demonstrating that there is no conceivable basis for the Act. *See Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Chevron,* 131 Ariz. at 441, 641 P.2d at 1285. A legislative enactment challenged under the rational basis test will pass constitutional muster unless it is proved beyond a reasonable doubt to be wholly unrelated to any legitimate legislative goal. *See Heller,* 509 U.S. at 320, 324, 113 S.Ct. 2637; *Chevron,* 131 Ariz. at 438, 641 P.2d at 1282 (party challenging constitutionality has burden to show beyond a reasonable doubt that legislation is infirm); *State v. Kelly,* 111 Ariz. 181, 184, 526 P.2d 720, 723 (1974), *cert. denied sub nom. Kelly v. Arizona,* 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975) (court must affirm act if it can imagine any set of facts to support the act). Moreover, the law "need not be in every report logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and this it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 99 L.Ed. 563 (1955), *quoted in Arizona Downs v. Arizona Horsemen's Found.,* 130 Ariz. 550, 556, 637 P.2d 1053, 1059 (1981).

¶ 53 We conclude that the rational basis test applies. Petitioners have viewed too expansively the interest at stake. Petitioners seek to have applied to them the rules and procedures applicable in the general civil commitment proceedings. But they have not pointed us to, and we have not found, a fundamental right to have particular procedures apply. The courts that have analyzed equal protection challenges based upon the application of differing sets of rules have applied the rational basis test, even in cases such as this one, where liberty may ultimately be at stake. *See Heller,* 509 U.S. at 325, 113 S.Ct. 2637 (applying rational basis test in upholding different proceedings for mentally ill and mentally retarded individuals); *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 449–50, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (same); *Baxstrom,* 383 U.S. at

111, 86 S.Ct. 760 (applying rational basis test to differential treatment between groups of "dangerous" and "nondangerous" mentally ill); *Minnesota ex rel. Pearson,* 309 U.S. at 274, 60 S.Ct. 523 (applying rational basis test in upholding sexual psychopath law); *State v. Clemons,* 110 Ariz. 79, 82, 515 P.2d 324, 327 (1973) (applying rational basis test to legislation that provided different commitment and release procedures for those "guilty but insane" and general civil commitment); *Illinois v. Pembrock,* 62 Ill.2d 317, 342 N.E.2d 28, 30 (1976) (applying rational basis test to uphold different procedures for SVPs and those committed under mental health code); *Tate,* 675 N.E.2d at 774–75 (rational basis test applied to classification). *Cf. Post,* 541 N.W.2d at 131–32 (unclear which standard applied, but finding state's "interest in protecting the public from dangerous mentally disordered persons" compelling). Indeed, dual commitment systems and standards for mentally ill and mentally retarded individuals seem common. *See Heller,* 509 U.S. at 327 n. 2, 113 S.Ct. 2637 (listing commitment statutes for more than 40 states).

¶ 54 Several years ago, our supreme court faced a similar analytical task in determining the appropriate standard under which to review medical liability review panels, which the legislature had just required as a precondition to bringing medical malpractice lawsuits. It determined that the right to bring an action was a fundamental right; thus any infringement of that right was to be strictly scrutinized. *See Kenyon,* 142 Ariz. at 83, 688 P.2d at 975. But the portions of the Medical Liability Review Act not affecting the essence of the fundamental right to bring the lawsuit—such as the screening process, the abolition of the collateral source rule, and the use of the panel's findings at trial—were reviewed to see whether they had a rational basis. *See Eastin v. Broomfield,* 116 Ariz. 576, 582–84, 570 P.2d 744, 750–52 (1977). Rational basis review was deemed sufficient even though the rules affected the evidence presented, the manner in which one could proceed, or the amount awarded in the medical malpractice lawsuit. *See id.* Similarly, in *State v. Ramirez,* 178 Ariz. 116, 122, 871 P.2d 237, 243 (1994), the supreme court ap-

plied rational basis review to legislation that regulated the right to appeal in death cases, actions undoubtedly affecting liberty interests. Citing *Kenyon* and *Eastin,* the court held that while strict scrutiny would apply to the right to bring an appeal, rational basis was the appropriate standard by which to review "those portions of a statute that do not affect the fundamental right to appeal but merely regulate it." *Id.* A similar analysis controls the inquiry here. Because Petitioners challenge the procedures of the Act rather than the right to commit SVPs on any basis, rational basis is the appropriate standard of review.

¶ 55 Our cases as well support our application of the rational basis test. In 1992, we applied the rational basis test in finding that persons acquitted of crimes by reason of insanity could be treated differently from persons civilly committed who had not been charged with crimes. *See State v. Helffrich,* 174 Ariz. 1, 4–5, 846 P.2d 151, 154–55 (App. 1992). In reaching that conclusion we relied on *Jones v. United States,* 463 U.S. 354, 370, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), in which the United States Supreme Court stated that persons acquitted of a crime by reason of insanity "constitute a special class that should be treated differently from other candidates for commitment." *Helffrich,* 174 Ariz. at 4–5, 846 P.2d at 154–55.

▇▇▇ ¶ 56 Having determined that the rational basis test applies, we must now examine whether the legislative classification satisfies the test. Unlike those subject to the general civil commitment statutes, Petitioners are persons who have been convicted of, charged with but found incompetent to stand trial for, or acquitted by reason of insanity of, one or more violent sexual acts. *See* A.R.S. § 36–3701(7)(a). The legislature has found that members of Petitioners' class tend to repeat their criminal acts and pose a higher risk of danger to the public than do other classes of mentally ill or mentally disabled persons. *See* 1995 Ariz. Sess. Laws 2007, 2016 § 10(3) (statement of legislative intent). Petitioners are persons who may suffer from a mental disorder that predisposes them to commit sexual acts and renders them dangerous to others. *See* A.R.S. § 36–

3701(5). Those subject to the general civil commitment process, on the other hand, suffer from a "mental disorder." *See* A.R.S. § 36–501(22) (1993), 36–533(A)(1) (1993) (allows court-ordered treatment for persons who, as a result of a mental disorder, pose a danger to themselves or others). They may pose a danger to themselves or be unable to care for themselves, but they do not necessarily pose a threat to others. Those in Petitioners' class may not suffer from a clinical mental disease or defect, and they may well be able to care for themselves. Given the differences between the groups, the legislature has determined that the underlying mental conditions of members of Petitioners' class render them unamenable to or inappropriate candidates for existing involuntary commitment procedures. This is the "evil" the legislature sought to remedy in passing the SVP Act. We hold that it was not irrational or unreasonable for the legislature to create a different classification for Petitioners.

▇▇▇ ¶ 57 The procedure for the commitment of SVPs differs from the procedure for those committed under the general civil commitment statutes in ways that bear a rational relationship to the differences between the classes. Although the legislature eliminated many of the most obvious differences by moving the SVP Act from title 13 to title 36 and making the rules of civil procedure and evidence applicable to proceedings under the Act, differences still exist. Some of those difference favor the Petitioners by affording them added protections. For example, Petitioners have the right to appointed counsel, to be present for the proceedings, to a jury trial, to commitment only upon a determination "beyond a reasonable doubt," and to an annual review of their status. Other procedures, such as the ineligibility for bond, as discussed in section II(E), are rationally related to the neutral magistrate's finding of potential dangerousness. Petitioners complain that following a determination of probable cause, they are held in a separate section at the state hospital and are required to wear distinguishing clothing. We find these requirements rationally supported by a neutral magistrate's finding that the Petitioners suf-

fer from a particular type of mental condition that renders them likely to commit violent sexual acts. Having to wear clothing that identifies them and segregating them from others allows them to be easily identified by the staff, which helps ensure the safety of the staff and others at the state hospital, and may help prevent escape. Moreover, we note that these last two differences are not compelled by statute.

¶ 58 Given the differences between the two groups, we find that the legislature's classification and the application of differing sets of rules is reasonable. *See Kenyon,* 142 Ariz. at 78, 688 P.2d at 970 (classification will be upheld unless it rests on grounds "wholly irrelevant" to achieving the states goals); *see also Minnesota ex rel. Pearson,* 309 U.S. at 274, 60 S.Ct. 523 (upholding sexual psychopath law against equal protection challenge); *Bailey v. Gardebring,* 940 F.2d 1150, 1153 (8th Cir.1991), *cert. denied, sub nom. Bailey v. Noot,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992) (equal protection not violated by treating persons who suffer from severe mental disorders differently from those with less serious disorders). As the trial court noted, there is no "requirement that the commitment statutes for sexually violent persons be a mirror image of the Title 36 civil commitment process" for those who are not SVPs. We agree. Reasonable classification does not violate equal protection. We find no equal protection violation on the facts before us.

■ ¶ 59 Petitioners also contend that the Act denies them equal protection because it does not apply to all potential SVPs, and therefore is too narrowly drawn. They note that the statute does not cover those already released from prison, those serving long terms in prison,[16] and those whom the state has declined to prosecute for reasons such as the running of the statute of limitations, insufficient evidence, or reluctant witnesses. Petitioners claim that this underinclusiveness

makes the Act arbitrary and unreasonable, and strips it of any relationship to a legitimate state interest.

¶ 60 The United States Supreme Court and the Wisconsin Supreme Court, among others, have rejected just such "all or nothing" challenges. *See, e.g., Minnesota ex rel. Pearson,* 309 U.S. at 274–75, 60 S.Ct. 523; *Post,* 541 N.W.2d at 133. In doing so, they noted that if the law "hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied." *Minnesota ex rel. Pearson,* 309 U.S. at 275, 60 S.Ct. 523 (citations omitted); *Post,* 541 N.W.2d at 133; *see also Linehan,* 557 N.W.2d at 186–87.

¶ 61 We, too, reject the claim, and for similar reasons. Although we recognize the serious consequences to Petitioners, we must consider the state's significant interest in protecting its citizens from individuals who have been judicially determined to be dangerous and its legitimate interest in treating SVPs. That the Act does not extend to every person who might be an SVP does not remove every rational basis for its existence. *See Minnesota ex rel. Pearson,* 309 U.S. at 275, 60 S.Ct. 523; *City of Tucson v. Wolfe,* 185 Ariz. 563, 917 P.2d 706 (App.1995) (that legislation is not drawn as precisely as it could be is not the question; rather it is whether the line drawn by the legislature is within constitutional limitations). Proof problems would abound for those never charged with a sexually violent crime, persons who might have been acquitted of the predicate offenses might be swept within the ambit of the SVP Act, and those incarcerated for long prison terms are already rendered nondangerous to society, thus accomplishing one of the legislature's goals in passing the SVP Act. We will not substitute our judgment for that of the legislature as to where precisely appropriate lines should be drawn to determine who should be subject to the Act.[17] *See Church v. Rawson Drug & Sundry*

---

16. Although unarticulated, Petitioners' claim seems to be that these individuals will not soon be subject to the Act and that those serving life sentences may never be subject to it.

17. Justice Holmes persuasively made the point that line drawing cannot be and need not be mathematically precise:

When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other ex-

*Co.,* 173 Ariz. 342, 351, 842 P.2d 1355, 1364 (App.1992). We conclude that the Act rationally advances a legitimate governmental goal and therefore has a rational basis.

▓ ¶ 62 Petitioners have also advanced equal protection claims under the Arizona Constitution. Despite the difference in the language between the Arizona provision and the federal clause,[18] they do not differ in general purpose. *See Valley Nat'l Bank,* 62 Ariz. at 554, 159 P.2d at 299 (state and federal equal protection clauses "have for all practical purposes the same effect"). We see no difference in underlying rationale that would militate in favor of interpreting the Arizona Equal Privileges and Immunities Clause differently from its federal counterpart, and Petitioners have presented no argument or authority that would persuade us that it should be applied differently under these circumstances. That being the case, we hold that Arizona's Equal Privileges and Immunities Clause provides no independent basis for relief.

¶ 63 The legislature has provided special civil commitment procedures for a narrowly defined group of persons whose members currently suffer from a mental disorder that predisposes them to commit acts of sexual violence. We do not find that the legislature lacked a rational basis in defining its class and therefore do not find a violation of equal protection.

G. *Due Process*

*Introduction*

▓ ¶ 64 Petitioners raise both procedural and substantive due process claims.

The amount of process one is due, however, depends upon the "importance of the interest at stake and the degree of its impairment." *Helffrich,* 174 Ariz. at 3, 846 P.2d at 153 (citations omitted). The central aspect of the Petitioners' procedural due process claims is that the Act fails to define its operative terms, or that, if defined, the definitions do not provide Petitioners with adequate notice of prohibited conduct and do not adequately guide or constrain law enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). They also assert that they were not informed of the possibility of commitment pursuant to the Act when they entered the plea agreements settling their cases.

¶ 65 Petitioners' arguments may also fairly be characterized as raising substantive due process claims. Specifically, Petitioners claim that the Act unconstitutionally allows the state to confine persons based on a mere *possibility* of future dangerousness, and therefore is arbitrary and capricious. They argue that commitment without proof of "immediate future harm" unconstitutionally regulates Petitioners' thoughts. We disagree and find that the Act satisfies Petitioners' due process rights.

*Substantive Due Process*

▓ ¶ 66 Petitioners allege that the Act is fundamentally unfair and violates due process by allowing them to be committed without requiring a showing of immediate harm to themselves or others. "The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness."

---

tremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark.
*Louisville Gas & Electric Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928)(Holmes, J., dissenting).

18. Arizona's provision focuses on providing a measure of equal opportunity. *See* Ariz. Const. art. 2, § 13; *Chevron,* 131 Ariz. at 441, 641 P.2d at 1285. The federal provision focuses on preventing discrimination. *See* U.S. Const. amend. XIV, § 1.

They differ in historical purpose as well: The federal provision was adopted to protect citizens against the federal government. Arizona's provision was spawned, in part, by fear of overreaching by businesses and industries. *See* John D. Leshy, *The Making of the Arizona Constitution,* 20 Ariz. St. L.J. 1, 96 (1988).

*State v. Melendez*, 172 Ariz. 68, 71, 834 P.2d 154, 157 (1992). Substantive due process prevents the government from engaging in arbitrary, wrongful actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). It precludes conduct that "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). For a civil commitment law to be valid, "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

 ¶ 67 The constitutional scrutiny that we should apply to substantive due process challenges to SVP laws is not clear. While "[f]reedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause,'" *Hendricks*, 521 U.S. at 356, 117 S.Ct. 2072 (quoting *Foucha*, 504 U.S. at 80, 112 S.Ct. 1780), the standard by which a court evaluates such claims has never been clearly identified. *See* Stephen R. McAllister, *Sex Offenders and Mental Illness: A Lesson in Federalism and the Separation of Powers*, 4 Psychol. Pub. Pol'y & L. 268, 273 (1998). The "[Supreme] Court has never applied strict scrutiny to the substance of state laws involving involuntary confinement of the mentally ill, much less to laws involving the confinement of insanity acquittees." *Foucha*, 504 U.S. at 119, 112 S.Ct. 1780 (Thomas, J., dissenting). SVP laws have nonetheless withstood the challenge under any standard that courts have purported to apply. *See Hendricks*, 521 U.S. at 346, 117 S.Ct. 2072 (upholding Kansas statute under a "reasonableness" standard); *Post*, 541 N.W.2d at 133 (upholding Wisconsin statute under "strict scrutiny" standard); *see also* authorities cited *supra* ¶ 53 (equal protection cases).

 ¶ 68 Petitioners are correct that one may not be constitutionally detained on the mere possibility of dangerousness. *See Foucha*, 504 U.S. at 82, 112 S.Ct. 1780; *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (a state may not "constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."). The Act, however, requires more than a mere possibility of dangerousness; it specifically requires that an accused SVP have a mental disorder that renders him "likely" to engage in acts of sexual violence. A.R.S. § 36–3701(7)(b). We have defined "likely" as probable rather than merely possible. *See State v. Johnson*, 181 Ariz. 346, 350, 890 P.2d 641, 645 (App.1995); *State v. Greene*, 168 Ariz. 104, 108, 811 P.2d 356, 360 (App.1991). Thus Petitioners may not be committed upon the mere possibility of future dangerousness.

¶ 69 To commit a person under the Act, the government must establish that the person is a sexually violent person:

7. "Sexually violent person" means a person to whom both of the following apply:

 (a) Has ever been convicted of or found guilty but insane of a sexually violent offense or who was charged with a sexually violent offense and who was determined incompetent to stand trial.

 (b) Has a mental disorder that makes the person likely to engage in acts of sexual violence.

A.R.S. § 36–3701(7).

¶ 70 The Act defines key terms such as "convicted" and "sexually violent offense," limiting the latter to a prescribed list of offenses. *See* A.R.S. § 36–3701(3) (defining conviction); A.R.S. § 36–3701(6) (defining sexually violent offense). The Act also requires a showing that the person suffers from a specific type of mental disorder that renders the person a danger to others. *See* A.R.S. § 36–3701(5). Dangerousness, like the mental disorder element as a whole, must

be proved beyond a reasonable doubt. *See id.* § 36–3707(A); *see also Jones,* 463 U.S. at 364, 103 S.Ct. 3043. The Act requires concrete evidence, not mere speculation, of behavior that is connected to an abnormal mental condition and that supports a prediction of future dangerousness to innocent victims. *See Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072 (noting that the supreme court has upheld civil commitment statutes that require both proof of present dangerousness and an additional factor such as "mental illness"). Thus Petitioners are not committed upon the mere possibility of future violence or punished for their thoughts.

¶ 71 The Act sufficiently limits its application to those who provide the greatest threat to society and have the greatest need for treatment. We thus agree with the Court in *Hendricks* that it "cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." *Id.* at 357, 117 S.Ct. 2072.

■ ¶ 72 Petitioners emphasize the difficulty of predicting future violent behavior. *See* Linn Turner Greenberg, *The Psychiatrist's Dilemma,* 17 J. Psychiatry & L. 381, 384 (1989). Although future behavior can never be predicted with certainty,[19] this alone does not render the Act violative of due process. We recognize the disagreement over the rate and magnitude of recidivism for various categories of sex offenders and different types of sex offenses. *See, e.g.,* Gene G. Abel et al., *Self–Reported Sex Crimes of Nonincarcerated Paraphiliacs,* 2 J. of Interpersonal Violence 3, 21 (March, 1987) (the number of offenses reported by "nonincarcerated child molesters ranged from 23.1 acts to 281.7 acts per offender"). However, the legislature has recognized, and there is no serious dispute, that recidivism rates are significant, particularly for sex offenders. *See id.; see also* 1995 Ariz. Sess. Laws 2007, 2015–16 § 10 (statement of legislative intent). Petitioners may argue to the jury the lack of certainty in predicting future dangerousness.

We must trust the adversary process "to sort out the reliable from the unreliable evidence and opinion about future dangerousness." *Zanelli,* 569 N.W.2d at 310 (quoting *Barefoot v. Estelle,* 463 U.S. 880, 901, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

■ ¶ 73 Petitioners express concern that some individual Petitioners may be subject to the Act "premised on old and possibly stale information." The legislature has acknowledged this concern, noting that "during the offenders' period of confinement the offenders do not have access to potential victims and will not engage in an overt act during confinement as required by the involuntary treatment procedures for continued confinement." 1995 Ariz. Sess. Laws 2007, 2016 § 10(3). Because incarcerated Petitioners have not been in an environment that allows them to reoffend, the legislature permits the trier of fact to consider prior offenses in determining whether an individual continues to suffer from a mental disorder that makes him likely to engage in future acts of sexual violence. That these convictions may be several years old does not strip them of relevancy. We agree with the Supreme Court that prior convictions serve a significant evidentiary purpose in establishing the potential for future dangerousness. *See Hendricks,* 521 U.S. at 362, 117 S.Ct. 2072; *Jones,* 463 U.S. at 364, 103 S.Ct. 3043 (evidence of criminal conviction "may be at least as persuasive as any predictions about dangerousness that might be made in civil-commitment proceeding[s]"; "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness."). The jury must determine based on all the evidence submitted to it whether the person continues to be sexually violent. That determination does not rest solely upon the prior conviction, but those convictions are relevant in making the determination.

■ ¶ 74 The relationship between the nature of commitment and the purpose for

---

19. As the Supreme Court has noted, "[t]he only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment." *Jones,* 463 U.S. at 365 n. 13, 103

S.Ct. 3043 (quoting *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412 (1956)). Such uncertainty, however, militates in favor of "pay[ing] particular deference to reasonable legislative judgments." *Id.*

which an SVP is committed, though not perfect, is reasonable. *See Helffrich,* 174 Ariz. at 4, 846 P.2d at 154. The legislature has found that "[s]ome sex offenders pose a high risk of engaging in sex offenses after being released from imprisonment or commitment and that protecting the public from sex offenders is a paramount governmental interest." *See* 1995 Ariz. Sess. Laws 2007, 2016 § 10(2). The legislature has also determined that members of Petitioners' group have "antisocial personality features that are unamenable to existing mental illness treatment modalities" and make Petitioners likely to engage in future acts of sexual violence. *Id.* § 10(3). Further, the legislature has found that the prognosis for treatment of these individuals is "poor" and the treatment needs are "very long-term." *Id.* Providing treatment for Petitioners through the SVP Act is the legislature's attempt to balance protection of society with Petitioners' interests in their freedom. *See Salerno,* 481 U.S. at 750–51, 107 S.Ct. 2095 (an individual's right to liberty "in circumstances where the government's interest is sufficiently weighty, [may] be subordinated to the greater needs of society"). The legislature's response to the sex crime problem and the terms it has selected to implement that response are reasonably related to its legitimate goals of treatment and deterrence, and we will defer to them. *See Maricopa County Juv. Action No. JT9065297,* 181 Ariz. at 81, 887 P.2d at 611 ("[L]egislative response to Phoenix's problems of gangs, drugs, and crime is not for this court to second-guess or to undo, except insofar as it may detrimentally have an impact on the constitutional rights of citizens."); *Linehan,* 557 N.W.2d at 184 (defer to legislative judgment in areas of medical uncertainty).

¶ 75 Petitioners' last claim is that less restrictive means—such as informing the public regarding Petitioners' release and location, granting lifetime probation, or requiring mandatory medication and treatment—would also palliate the risk to the community. Although that might be true, the choice of remedies for this social problem lies with the legislature, not the courts. Unless the course of action the legislature selects is unconstitutional or illegal, we must defer to

it. We may not substitute our views as to whether it is the best course for resolving the problem.

¶ 76 Finally, Petitioners have provided us with no support for the proposition that the Arizona Constitution provides greater protection than the United States Constitution for Petitioners in this area, and we find none. Therefore, we conclude that the Act satisfies substantive due process requirements under both the state and federal constitutions.

### Procedural Due Process

a. Standing

¶ 77 As a threshold inquiry, we address the State's challenge to Petitioners' standing to raise overbreadth and vagueness claims. Generally, a party may not challenge a statute on overbreadth or vagueness grounds if that party's conduct is clearly prohibited by the statute. *See State v. Musser,* 194 Ariz. 31, ¶ 5, 977 P.2d 131 (1999) (citing *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); *see also Maricopa County Juv. Action No. JT9065297,* 181 Ariz. at 73, 887 P.2d at 603 (citing *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)). Petitioners, however, argue that they may make a "facial" attack on the Act because the Act's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908.

¶ 78 Because standing is not a constitutional jurisdictional requirement in Arizona, *see State v. B Bar Enterprises, Inc.,* 133 Ariz. 99, 100 n. 2, 649 P.2d 978, 980 n. 2 (1982), we find that the Petitioners have standing to challenge the Act on overbreadth and vagueness grounds. An exception to the standing requirement arises when the statute's potential deterrent effect on First Amendment activities is "both real and substantial." *Juvenile Action No. JT9065297,* 181 Ariz. at 73, 887 P.2d at 603 (citing *Young v. American Mini Theatres, Inc.,* 427 U.S.

50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). Petitioners have alleged that the Act severely chills the protected speech of persons subject to the Act. *See infra* ¶¶ 95–103. Further, standing is a matter of discretion, and although it is rare, we have waived the standing requirement "in cases involving issues of great public importance that are likely to recur." *Sears v. Hull,* 192 Ariz. 65, ¶ 25, 961 P.2d 1013 (1998). We thus address the merits of Petitioners' claims.[20]

b. Vagueness

¶ 79 To satisfy due process requirements, statutes must be sufficiently clear and concrete that they provide "person[s] of ordinary intelligence a reasonable opportunity to know what is prohibited" and contain explicit standards of application so as to prevent arbitrary and discriminatory enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Hernandez v. Frohmiller,* 68 Ariz. 242, 251–52, 204 P.2d 854, 860 (1949). Petitioners claim that the Act is so vague that it fails to give them adequate notice of the conduct that may subject them to the terms of the Act.

¶ 80 The Act, however, does not proscribe "conduct." Instead, it permits the confinement, for treatment and security purposes, of those who are "sexually violent persons" who have previously committed at least one "sexually violent offense." Both phrases are specifically defined in the Act. *See* A.R.S. § 36–3701(6)–(7). A judicial factfinder must find, beyond a reasonable doubt, that the person suffers from a "mental disorder that makes the person likely to engage in acts of sexual violence." *Id.* § 36–3701(7). "Mental disorder" means "a paraphilia, personality disorder or conduct disorder or any combination of paraphilia, personality disorder and conduct disorder that predisposes a person to commit sexual acts to such a degree as to render the person a danger to the health and safety of others." *Id.* § 36–3701(5). We find these terms adequately defined and capable of comprehension and enforcement.

¶ 81 Petitioners specifically attack the vagueness of the limitation that the alleged SVP's mental disorder "makes the person *likely to engage* in acts of sexual violence." *Id.* § 36–3701(7)(b) (emphasis added). Although Petitioners recognize that "likely" is synonymous with "probable," *see* Webster's New World Dictionary 819 (2d ed.1979); *Johnson,* 181 Ariz. at 350, 890 P.2d at 645, they nonetheless argue that the term is too broadly defined to satisfy due process. We disagree.

¶ 82 Courts tolerate some vagueness in definitions, even in the criminal context:

> Words inevitably contain germs of uncertainty and ... there may be disputes over the meaning of such terms.... "[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest."

*Broadrick,* 413 U.S. at 608, 93 S.Ct. 2908 (quoting *United States Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)); *see also Hernandez,* 68 Ariz. at 251, 204 P.2d at 860 ("While a statute must be definite to be valid, and reasonable precision is required, ... merely because it is difficult to interpret does not condemn it as offending the constitution."); *see also Zanelli,* 569 N.W.2d at 307–08 ("substantially probable" not unconstitutionally vague).

¶ 83 The term "likely" is reasonably understood and effectively used often in our laws. *See, e.g., Lathrop v. Arizona Bd. of Chiropractic Examiners,* 182 Ariz. 172, 178, 894 P.2d 715, 721 (App.1995) (holding that clause "character likely to deceive or defraud the public" is a constitutionally adequate standard to limit the term "unprofessional conduct"); *State v. Poehnelt,* 150 Ariz. 136, 144, 722 P.2d 304, 312 (App.1985) (holding that clause "under circumstances likely to

**20.** We address Petitioners' overbreadth claims *infra* Section H, ¶¶ 95–103.

produce death or serious physical injury" provides a clear standard by which to limit "endanger" for purposes of child abuse statute); *Johnson,* 181 Ariz. at 350, 890 P.2d at 645 (same). We find the terms of the Act sufficiently definite that reasonable persons can know their rights and obligations. *See Hernandez,* 68 Ariz. at 251–52, 204 P.2d at 860.

¶ 84 Nor do we find persuasive Petitioners' arguments that the Act is so vague that it might be arbitrarily enforced. Contrary to Petitioners' concerns that each county attorney must form his or her own definitions and thus "functions as a jailer at will," the Act provides adequate guidelines for its implementation and enforcement. Indeed, aside from their specific attack on the phrase "likely to engage" and the alleged failure of the Act to provide an "immediacy of potential harm" requirement,[21] Petitioners point to no portion of the Act that is not adequately defined. As a result, we cannot say that the Act "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 108–09, 92 S.Ct. 2294.

¶ 85 Moreover, the legislature has built in procedural safeguards that provide constitutionally adequate protection against arbitrary enforcement. *See State ex rel. Purcell v. Superior Court,* 111 Ariz. 582, 584, 535 P.2d 1299, 1301 (1975). Among other protections, a person's mental disorder and dangerousness must be proved "beyond a reasonable doubt" before an individual may be confined under the Act. A.R.S. § 36–3707. We thus reject Petitioners' claims that the Act is unconstitutionally vague.

c. Consequences of Plea Agreement

¶ 86 Petitioners argue that, because the SVP Act was passed after they pled guilty and were sentenced, they were never informed of all the potential consequences of pleading guilty. This failure to notify them

of all the consequences of their plea agreements was fundamentally unfair, they claim, and violates due process. *See* U.S. Const. amend. XIV, § 1; Ariz. Const. art. 2, § 4; *see also Melendez,* 172 Ariz. at 71, 834 P.2d at 157 (the touchstone of due process under the Arizona and federal constitutions is fundamental fairness). They do not say what relief they seek as a result of the alleged violation. We assume that they seek to avoid the application of the SVP Act, not to invalidate their plea agreements. *See State v. Diaz,* 173 Ariz. 270, 273, 842 P.2d 617, 620 (1992) (defendant must thoroughly understand the plea agreement's "ramifications and be apprised of both the sentencing range and the rights forfeited"); *State v. City Court,* 131 Ariz. 236, 237, 640 P.2d 167, 168 (1981) (one who pleads without knowing the punishment that must be imposed pleads guilty under a misapprehension).

¶ 87 It is true that when these Petitioners entered their plea agreements, the SVP Act had not been enacted, and thus Petitioners could not have been informed of its provisions. Petitioners are not correct, however, that the plea agreements alone subject them to commitment under the SVP Act. That Act applies as well to those who were convicted by judge or jury and to those merely charged with a predicate offense who were deemed incompetent to stand trial. *See* A.R.S. § 36–3701(7)(a). We will assume, for purposes of this special action, that Petitioners argue that they might have taken their chances at trial had they been fully informed of the consequences of the plea, including being provided information regarding the then-unenacted SVP Act.[22]

¶ 88 As a general proposition, a plea is an agreement between the state and a defendant. *United States v. Lewis,* 979 F.2d 1372, 1375 (9th Cir.1992); *see also State v. Taylor,* 158 Ariz. 561, 563–64, 764 P.2d 46, 48–49 (App.1988). Petitioners argue that the state has breached its agreement with them because the court did not advise them, as it is

---

21. Petitioners' argument that the Act impermissibly fails to provide an "immediacy" requirement was addressed more fully in Section II(G), *supra* ¶¶ 66–72.

22. We have already determined that the Act does not violate the ex post facto provisions of the state or federal constitutions. *See supra* § II(D), ¶¶ 41–44.

required to do, of all the *direct consequences* of pleading guilty.

¶ 89 Whether the state was required to advise Petitioners of the potential for future detention under the SVP Act turns on whether the consequence is a direct or automatic result of the plea, or merely a possible or collateral consequence.[23] *See Yuma County Juv. Action No. J-95-63,* 183 Ariz. 228, 230, 902 P.2d 834, 836 (App.1995). A collateral consequence is one that is contingent on a future event, the occurrence of which is unknown when the defendant is sentenced. *See id.* at 231, 902 P.2d at 837. A direct consequence, on the other hand, is one that has a "definite, immediate and automatic effect on the range of the defendant's punishment." *Id.* Petitioners argue, and our dissenting colleague agrees, that because the effect of the Act is definite, immediate, and automatic, the consequences of the SVP Act are direct, not collateral, and the state therefore had a duty to inform them, before they pled guilty, of the potential for commitment under its terms.

¶ 90 Petitioners misstate the consequence at issue. While *review* under the Act is automatically triggered by the charge of a specified crime, Petitioners complain not of the review, but of the potential commitment, which does not necessarily and automatically follow from the passage of the SVP Act, from review under the Act, or from the pleas Petitioners entered. *See State v. Myers,* 199 Wis.2d 391, 544 N.W.2d 609, 610 (Wis.App. 1996) (defendant need not know, before signing plea, of the potential for future commitment at some unknown date in the future); *Hay,* 953 P.2d at 676 (same). Civil commitment will occur only if the state demonstrates beyond a reasonable doubt that a Petitioner currently suffers from a mental disorder that makes it likely that he will engage in acts of sexual violence. *See* A.R.S. § 36-3707; *see also Hendricks,* 521 U.S. at 346, 117 S.Ct. 2072 (Kennedy, J., concurring) ("Confinement of such individuals is permitted even if it is pursuant to a statute enacted after the crime has been committed and the offender has begun serving or has all but

completed serving a penal sentence, provided there is no object or purpose to punish.").

¶ 91 A trial judge need not inform a defendant of every conceivable effect of pleading guilty. *See State v. Rodriguez,* 17 Ariz.App. 553, 554, 499 P.2d 167, 168 (1972). Rule 17.2 of the Arizona Rules of Criminal Procedure sets forth the information of which a defendant must be advised before pleading guilty. That information includes the nature of the charge, the constitutional rights given up by pleading guilty, and the nature and range of possible sentences, including special conditions regarding sentence. A judge need not advise of special conditions, however, unless they are a direct consequence of pleading guilty. *See Yuma County Juv. Action No. J-95-63,* 183 Ariz. at 230-31, 902 P.2d at 836-37. As set forth above, detention for treatment under the SVP Act is not a direct consequence of pleading guilty.

¶ 92 We find support for this position in the cases holding that deportation proceedings are a collateral consequence of conviction rather than a direct consequence, and therefore failing to inform defendants that pleading guilty will subject them to deportation proceedings does not violate due process. *See id.* at 231, 902 P.2d at 837 (citing *United States v. Santelises,* 476 F.2d 787, 790 (2d Cir.1973)); *see also State v. Vera,* 159 Ariz. 237, 238-39, 766 P.2d 110, 111-12 (App. 1988) (citing several cases) (deportation is a collateral consequence of which defendant need not be advised). Nor has the loss of prison "good time credit" triggered by a guilty plea been found to be such a direct consequence that the court was required to advise a defendant of it, even though the loss of the credits caused the defendant to serve more time in jail. *See Cuthrell v. Director,* 475 F.2d 1364, 1366 (4th Cir.1973).

¶ 93 That the first two prosecutions under the Act have not resulted in findings that either defendant was an SVP also supports our conclusion that the consequences are collateral, not direct. *See State v. Bogess,* No. CV 98-09206 (Maricopa County Superior

---

**23.** Courts have not treated the seriousness of the consequence as a relevant jurisprudential concern in the direct-versus-collateral consequences inquiry.

Court); *Rineer v. Superior Court,* 194 Ariz. 45, 977 P.2d 767 (1999) (predicate act not listed in A.R.S. § 36–3701(6)).

¶ 94 The rationale is that one who pleads guilty should be informed of the punishment that must be imposed so that he can make an intelligent and knowing plea. *See Vera,* 159 Ariz. at 238, 766 P.2d at 111. Here, confinement for treatment under the SVP Act is not "punishment," nor must it be imposed. Therefore, there was no requirement that Petitioners be told of the Act's terms before they pled guilty.

### H. *First Amendment Challenges*

¶ 95 The Act provides that Petitioners' psychological reports and tests may be used in the SVP proceedings. *See, e.g.,* A.R.S. § 36–3702(B)(2) (requiring disclosure of records). Petitioners argue that requiring disclosure to the courts of medical records relating to treatment undermines the physician-patient privilege, impermissibly chills the free flow of constitutionally protected speech, and prevents persons subject to the Act from seeking treatment. Petitioners assert that because the communication between patients and doctors is protected speech, any limitation on that speech violates the First Amendment. We conclude, however, that even if the disclosures required by the Act do implicate protected speech, the Act nonetheless survives constitutional scrutiny.

¶ 96 The physician-patient privilege on which Petitioners rely is a creature of statute. *See* A.R.S. § 32–2085(A) (1992 & Supp.1998); *State v. Morales,* 170 Ariz. 360, 363, 824 P.2d 756, 759 (App.1991) (recognizing that "there was no such privilege at common law"). Because it is a statutory privilege, the legislature is generally free to limit it, as it has here. Indeed, the legislature has, in several instances, determined that the public good requires that statutory or rule-based confidentiality give way to serve a greater good. For example, the physician-patient privilege is sacrificed if a treating physician suspects child abuse. *See* A.R.S. § 32–2085(A) (Supp.1998) (imposing

on psychologist "a duty to report information as required by law"). The attorney-client privilege also yields if a client reveals to an attorney a present intent to commit a criminal act or to cause serious harm to another. *See* Ariz. R. Prof. Conduct E.R. 1.6. The physician-patient privilege also regularly is disregarded in weighing the needs of parties to civil litigation. *See, e.g.,* Ariz. R. Civ. P. 35 (physical and mental examination of parties). In none of the foregoing contexts has a court recognized a free speech violation. In balancing Petitioners' needs against the government's interest in protecting the public and treating SVPs, the legislature may similarly make the policy determination that one interest outweighs another.[24]

¶ 97 Aside from the counterbalancing governmental interests identified above, Petitioners' legal premise—that all communication between patients and doctors is protected speech and therefore any limitation on that speech violates free speech protections—is not free from debate. The Supreme Court has addressed First Amendment challenges to regulations that affected the physician-patient relationship only in the context of laws that directly regulated the content of physicians' speech. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In *Rust,* the Court upheld a regulation that prohibited doctors from counseling patients regarding abortion. Those laws survived First Amendment challenges, even though they restricted the physicians' speech based upon its content. *See id.* Here, of course, the Act does not regulate the content of the communication between physicians and patients, but simply requires disclosure of the reports, whatever their content might be. Although the Act has the potential to "chill" patients' willingness to speak freely to their physicians, it imposes a less intrusive burden than did the act at issue in *Rust.*

¶ 98 Because the Act does not regulate the content of speech, but only places an incidental burden on speech, the disclosure requirement will not run afoul of the First Amendment if it furthers "an important or

---

**24.** Petitioners' complaint that, in discouraging full and frank disclosure to treating professionals, the Act "thwarts public policy" is an argument best addressed to the legislature.

substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. Albertini,* 472 U.S. 675, 687–88, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

¶ 99 We have already discussed the State's compelling interest in treating SVPs and protecting citizens from harm. *See generally* 1995 Ariz. Sess. Laws 2007, 2016 § 10. The required disclosures, which include Petitioners' "psychological and psychiatric tests and assessment reports and supporting information" and *other notes or reports prepared* while a Petitioner was under an agency's authority, A.R.S. § 36–3702(B)(2)(a)—(b), will assist the jury in determining whether an alleged SVP remains a danger to others and therefore needs further treatment or whether the person should be discharged or released to a less restrictive alternative placement. In this way, the disclosure of records furthers the important governmental goals of protecting the public and providing proper treatment to the individual.

¶ 100 The government's interest is unrelated to the suppression of free expression. Petitioners have not advanced a claim to the contrary. It seems pellucid that the more freely a patient speaks, the greater the chance of rehabilitation.

¶ 101 Finally, allowing the medical reports to be disclosed for evidentiary purposes is no greater an imposition than is necessary to further the government's interest. The information is released solely for use by the court in the SVP proceedings. The legislature has determined that those convicted of sex crimes have a reduced expectation of privacy and that "overly restrictive confidentiality and liability laws governing the release of information about sexual predators have reduced the willingness of agencies to release information" and that the refusal to disclose information to parties that should have access to it has "increased the risk to public safety." 1995 Ariz. Sess. Laws 2007, 2016 § 10(2); *see also Arizona Dep't of*

*Pub. Safety,* 190 Ariz. at 495, 949 P.2d at 988. These legitimate concerns justify the legislature's determination that Petitioners' records may be used for evidentiary purposes in the SVP proceedings. Providing the information helps to protect the public from those who have not been rehabilitate and to ensure that those who need additional treatment will receive it. If Petitioners need additional protection, they may request that information be submitted to the court under seal or that the file be sealed.

¶ 102 We thus conclude that the Act does not impermissibly infringe Petitioners' interest in speaking freely to their treating physicians. It is not unconstitutionally overbroad, but has been appropriately circumscribed to serve the government's legitimate interests while affecting the Petitioners' interests as minimally as possible.

¶ 103 Finally, we are aware that the Arizona Constitution does in some circumstances provide greater protection of speech than does the federal constitution. *See Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 354–55, 773 P.2d 455, 459–60 (1989); *Phoenix Newspapers, Inc. v. Superior Court,* 101 Ariz. 257, 418 P.2d 594 (1966). However, Petitioners have not demonstrated how it would do so in this case, and our research has not shown it. We thus conclude, given the facts of this case, that the Act does not violate Article 2, section 6 of the Arizona Constitution.

## I. *Separation of Powers*

¶ 104 Petitioners claim that the Act violates separation of powers because, by providing that the Arizona Rules of Civil Procedure and Evidence will apply in proceedings under the Act, the legislature has prescribed the rules of procedure and evidence to be applied in court cases. This power, they correctly observe, is reserved to the Arizona Supreme Court. *See* Ariz. Const. art. 6, § 5; *Arizona Podiatry Ass'n v. Director of Ins.,* 101 Ariz. 544, 546, 422 P.2d 108, 110 (1966) (Supreme Court's power to make rules "may not now be reduced or repealed by the Legislature").

¶ 105 Although Arizona's Constitution contains a strong prohibition upon the usurpation of the powers of one branch of government by another branch, *see* Ariz. Const. art. 3;[25] *Mecham v. Gordon,* 156 Ariz. 297, 300, 751 P.2d 957, 960 (1988), the Arizona Supreme Court has recognized that there is some permissible—and sometimes necessary and practical—blending of authority among the branches of government. *See San Carlos Apache Tribe,* 193 Ariz. 195, ¶ 37, 972 P.2d 179 (citing *J.W. Hancock Enters., Inc. v. Arizona Registrar of Contractors,* 142 Ariz. 400, 405, 690 P.2d 119, 124 (App.1984)). This court, too, has recently held that the fact "[t]hat a statute creates a procedural rule does not automatically render it invalid as a violation of the separation of powers provision." *Encinas v. Pompa,* 189 Ariz. 157, 159, 939 P.2d 435, 437 (App.1997). The critical question is whether the exercise of power usurps the power of another branch of government. *See id.; see also State ex rel. Woods v. Block,* 189 Ariz. 269, 275–76, 942 P.2d 428, 434–35 (1997).

¶ 106 In this case, the SVP Act creates a new court procedure for determining whether certain persons should be committed to a DHS facility. It would be impractical to delay application of the statute until the Supreme Court adopted appropriate rules to govern the court proceedings. As long as the rules are reasonable and workable and do not impermissibly infringe on the constitutional power vested in the supreme court, the rules selected by the legislature—the Arizona Rules of Civil Procedure and Evidence—may be used until the supreme court determines that other rules should apply. *See State ex rel. Purcell v. Superior Court,* 107 Ariz. 224, 227, 485 P.2d 549, 552 (1971); *State v. Blazak,* 105 Ariz. 216, 217–18, 462 P.2d 84, 85–86 (1969); *see also Encinas,* 189 Ariz. at 159, 939 P.2d at 437 (adopting the "reasonable and workable" standard). This exercise of power seems practical and not intrusive upon the court, for the court wields the ultimate power to change the applicable rules should it wish to do so. *See Arizona Podiatry Ass'n,* 101 Ariz. at 546, 422 P.2d at 110 (affirming Court's ability to make rules for court proceedings).

¶ 107 We find that the legislature's selection of rules to apply to a newly created procedure for commitment, subject as it is to the court's review and revision, does not usurp judicial power but merely complements it. It therefore does not violate Arizona's separation of powers provision.

### III. CONCLUSION

¶ 108 In analyzing an SVP Act very similar to Arizona's, the United States Supreme Court found the act to be civil, not criminal, in nature. It therefore held that the act did not violate the rights of the petitioners in that case to due process and to be free from ex post facto laws and double jeopardy. *See Hendricks,* 521 U.S. at 371, 117 S.Ct. 2072. The Court was concerned about the potentially indefinite duration of the confinement in that case, but found that the act before it met constitutional minima because it was linked not to any punitive objective, but to the purpose of holding and treating individuals until their mental condition no longer causes them to be a threat to others. *See id.* at 363–64, 117 S.Ct. 2072. We hold that the same is true regarding Arizona's SVP Act.

¶ 109 Although we share the trial court's concern about the lack of treatment for those now incarcerated in the state's penal institutions, we note that Arizona's SVP Act requires far greater treatment than was required under Kansas's SVP Act. We have no reason not to believe that treatment will be forthcoming. Should that treatment fail to materialize, we trust that we will see Petitioners again. To those who complain that the Sexually Violent Persons Act is unduly punitive or could result in extraordinarily long terms of commitment, we note that the civil act at issue in this case requires review at least annually and provides release from

**25.** Article 3 of the Arizona Constitution provides as follows:

The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

confinement or even total discharge if the evaluation shows that the person has been treated and no longer poses a danger to others.

¶ 110 In sum, we hold that Arizona's SVP Act meets constitutional minimum standards, under both the federal and Arizona constitutions, in the following areas: equal protection, due process, ex post facto laws, double jeopardy, free speech, vagueness, and overbreadth. In addition, it does not violate the Arizona Constitution's separation of powers provision. Although the Act has the potential to require long-term civil commitment of certain sexually violent persons, we conclude that the Act is lawful and constitutional.

¶ 111 We therefore accept jurisdiction of the Petition for Special Action, but deny relief. We remand the case to the trial court for further proceedings.

CONCURRING: SHELDON H. WEISBERG, Presiding Judge.

KLEINSCHMIDT, Judge, dissenting.

¶ 112 I respectfully dissent. I think that fundamental fairness requires that persons who plead guilty to violent sex crimes must be advised that they might be detained for life under the Sexually Violent Persons Act. All of these petitioners pled guilty without knowing about the Act. All of them have served their sentences, so setting aside their pleas would be an inadequate remedy. The relief they are entitled to is exclusion from the provisions of the Act. *See Brock v. Weston,* 31 F.3d 887 (9th Cir.1994).

¶ 113 I would accept jurisdiction, grant relief and decline to address the remaining issues because several of the more serious of those issues turn on the adequacy of the treatment afforded to persons detained under the Act. In my opinion, the record is inadequate to permit an informed judgment on that point.

¶ 114 The majority concludes that the petitioners are subject to the Act even though they were not informed that it could be applied to them. The majority bases this conclusion on the view that the possibility that the petitioners would be detained under the Act is a collateral consequence of the plea because the Act does not have a "definite, immediate and automatic effect on the range of the defendant's punishment." *See Appeal in Yuma County Juvenile Action No. J–95– 63,* 183 Ariz. 228, 231, 902 P.2d 834, 837 (App.1995).

¶ 115 The first problem with the majority's conclusion is that it does not acknowledge that *exposure to the process* provided for in the Act, as opposed to ultimate detention under the Act following trial, is certain enough, and punitive enough, to be a consequence of the plea in and of itself. Every person who has pled guilty to a violent sexual offense and who has served his sentence is, at the discretion of a prosecutor, subject to continued detention. Assuming the existence of probable cause, every such person is subject to trial and detention up to and during trial, with all of the loss of freedom, aggravation, and anxiety that such entails.

¶ 116 Even if one accepts the majority's premise that the relevant inquiry is whether a person will be *detained following trial under the Act,* there is a problem with the majority's application of the general rule that anything that does not automatically ensue from a plea is a collateral effect of the plea. Given the magnitude of the risk here—confinement for life—the application of the general rule is too formulaic. Every guilty plea is the result of a risk benefit analysis. It is not just the *likelihood* of a harm that must be weighed, but the *magnitude* of the harm that might ensue from a plea of guilty that must be taken into account. A prudent person may hesitate, and indeed refuse, to undertake a risk of catastrophic harm even if the chance that the harm will occur is low. An approach that makes the certainty of an event the sole touchstone of whether that event is a consequence of the plea may work well for the ordinary risk, but when it comes to the risk of indefinite detention, that formula is too rigid to meet the standard of fundamental fairness.

¶ 117 Courts do recognize that some consequences are not collateral, even though they are contingent. This is particularly true where the consequence involved is very serious. For example, when the question is

whether defendants who plead guilty to multiple crimes must be told that they can receive consecutive sentences—which are not imposed automatically—many jurisdictions require that defendants be advised of that *possibility.* See *State v. White,* 587 N.W.2d 240 (Iowa 1998), and cases cited therein. The only reason Arizona does not require defendants to be advised of the possibility of consecutive sentences is not that such sentences are contingent as opposed to automatic, but that the Supreme Court of Arizona has said that the possibility of receiving consecutive sentences for multiple crimes is so obvious that everyone is presumed to know it. *See State v. Wesley,* 131 Ariz. 246, 248, 640 P.2d 177, 179 (1982); *State v. Gordon,* 125 Ariz. 425, 427, 610 P.2d 59, 61 (1980); and *State v. Young,* 106 Ariz. 589, 590, 480 P.2d 345, 346 (1971).

¶ 118 A case that illustrates that even contingent possibilities can be a direct consequence of a plea, in a context quite similar to the case now before us, is *Ashley v. State,* 614 So.2d 486 (Fla.1993). There the state sought to impose the sentence-enhancing provisions of a habitual offender act upon a defendant who had pled guilty without being advised, as required by a rule of criminal procedure, of the state's intent to invoke the act. The court was aware of an earlier decision of another Florida appellate court in *Zambuto v. State,* 413 So.2d 461 (Fla.App. 1982), which held that the imposition of the habitual offender act was a mere collateral consequence of the plea because its application depended on specific factual findings and an exercise of the court's discretion. The court noted the existence of *Zambuto* but, without explanation, refused to follow it. *Ashley,* 614 So.2d at 489 n. 5. The court ruled

that the defendant was not subject to the habitual offender law.

¶ 119 The next problem I see with the majority's conclusion is that the risk to these petitioners of being found to be sexually violent persons and detained indefinitely thereafter is far more than a "conceivable effect" of the plea.[26] It is highly probable that all of these petitioners will be subjected to indefinite detention or other severe restriction. If a petitioner fits the Act's definition of a sexually violent person, the result is a foregone conclusion. Even if a petitioner does not objectively fit the definition of a sexually violent person, the prior conviction, the accusation, popular fear of violent sex crime, and indifference to the fate of these pariahs will make a fair adjudication very difficult.[27]

¶ 120 Having concluded that all of these petitioners are entitled to relief, I turn to the explanation of why I would not address the remaining issues in the case. I think a piecemeal approach to the issues should be avoided, and the resolution of several of the most serious constitutional challenges the petitioners raise—for example, double jeopardy and ex post facto—depends on whether the act is civil and regulatory as opposed to criminal and punitive. As the State in its briefs and the majority in its opinion concede, that question turns on the adequacy of the treatment afforded the persons detained under the Act. *See Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The record before us does not provide enough information on this question to allow a considered judgment on the validity of the statute.

¶ 121 It is true that the trial judge found that the petitioners were to be housed at a facility separate and apart from the prison and that the State had hired an expert to

---

**26.** *See State v. Rodriguez,* 17 Ariz.App. 553, 554, 499 P.2d 167, 168 (1972) (defendants need not be advised of every conceivable effect of the plea).

**27.** In one case that has gone to trial under the Act, the defendant was acquitted. There, however, the defendant had served his sentence and had been released. Seven years later he was convicted of failing to register as a sex offender and after his sentence for this conviction was served the state invoked the Sexually Violent Persons Act. Evidence was admitted to show that

the defendant had lived in the community for seven years without being charged with other offenses. *See* record in *State v. Boggess,* No. CV 98–09206 (Maricopa County Superior Court). An appellate court may take judicial notice of the content of the record in other cases. *See Scottsdale Mem'l Health Sys., Inc. v. Clark,* 157 Ariz. 461, 468, 759 P.2d 607, 614 (1988); *State v. Valenzuela,* 109 Ariz. 109, 110, 506 P.2d 240, 241 (1973); Udall, et al., Arizona Practice, The Law of Evidence § 152 (3d ed.1991).

devise a treatment program for them. The statute was new and there was little experience to go on so the trial judge, in essence, took it on faith that there would be a genuine effort to treat the petitioners.

¶ 122 Unlike the trial judge, I am not willing to trust the State on this point. The State's record in caring for and treating the mentally ill is not a good one. While I believe that the State is notorious for its indifference in this regard,[28] there is more specific support for my skepticism. Ten years ago, in *Arnold v. Department of Health Services*, 160 Ariz. 593, 775 P.2d 521 (1989), our supreme court noted that Arizona was last among all of the states in providing care for the chronically mentally ill. The court found that both state and county governments had failed to provide mandated mental health care to such persons. The opinion, among other things, cited the testimony of an expert witness who said that there was "no system at all" and that what care that did exist was "chaotic." *Id.* at 599, 775 P.2d at 527. The supreme court upheld the trial court's order directing the respective agencies to provide the required care.

¶ 123 Ten years after the supreme court decided *Arnold,* that case remains open. The superior court retains jurisdiction of the matter in an attempt to see that the mandate for care is carried out. As recently as March 1 of this year, the judge who oversees the case, during the course of a status conference, expressed concern about delay in implementing programs and sought additional information from the Department of Health Services and the Governor's Office regarding proposed funding. *See* Minute Entry dated March 1, 1999, in *Arnold v. Sarn,* No. C–432355 (Superior Court of Maricopa County). I see no reason to believe that the State will make any more real effort to treat these petitioners than it has made to treat the mentally ill who have proven to be relatively harmless.

28. Judicial notice as to matters of common knowledge is a broad concept in Arizona. *See, e.g., Miceli v. Industrial Comm'n,* 135 Ariz. 71, 659 P.2d 30 (1983) (Tucson had ample supply of psychiatric specialists); *International Bhd. of Carpenters and Joiners of America, Local No. 857*

¶ 124 In conclusion, while I am not willing to say that the petitioners have carried their burden of demonstrating that the Act is unconstitutional because treatment is illusory, I would not proceed, when it is not necessary for the resolution of this matter, to entrench the notion that the treatment available is adequate to justify categorizing the Act as civil in nature.

*v. Todd L. Storms Constr. Co.,* 84 Ariz. 120, 324 P.2d 1002 (1958) (economic effect of picketing); *Doan v. Board of Supervisors,* 21 Ariz. 240, 187 P. 265 (1920) (Counties pay exorbitant interest on indebtedness).