793 So.2d 6 (2001)
Donald WATROUS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D00-421.
District Court of Appeal of Florida, Second District.
March 7, 2001.
Rehearing Denied August 17, 2001.
*7 PER CURIAM.
Donald Watrous appeals the summary denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. In his motion Mr. Watrous alleged that his plea was involuntary and his counsel ineffective because he was not advised that the plea would subject him to possible civil commitment under the Jimmy Ryce Involuntary Civil Commitment for Sexually Violent Predators' Treatment and Care Act (hereinafter "the Act"). See §§ 394.910-931, Fla. Stat. (2000). He further alleged that counsel erroneously advised him that he would be released from custody almost immediately after pleading. We conclude that Mr. Watrous's second claim is facially sufficient and reverse as to it.
On June 21, 1999, Mr. Watrous pleaded guilty to three counts of handling and fondling a child under sixteen in exchange for a negotiated sentence of ten years' prison. He alleged that prior to entering the plea he was advised by his attorney that due to the amount of credit for time served that he had, he would be released from custody *8 almost immediately.[1] He further asserts that he was not advised by either his attorney or the trial court that the plea would subject him to possible long-term involuntary civil commitment under the Act.
On July 16, 1999, the State filed an involuntary civil commitment petition against Mr. Watrous. Mr. Watrous, through counsel, filed the instant motion for postconviction relief in the trial court on September 24, 1999.[2] The trial court denied the motion, finding that civil commitment under the Act is a collateral consequence of the plea and neither the trial court nor counsel is required to advise the defendant of such a collateral consequence. The trial court did not address Mr. Watrous's related claim that counsel affirmatively misadvised him about when he would be released from custody.
We first address Mr. Watrous's claim that his plea was involuntary and his counsel ineffective because he was not advised of the possible effects of the Act. The trial court is correct that a trial court and counsel are generally only required to advise a defendant of the direct consequences of a plea and not the collateral consequences. See State v. Ginebra, 511 So.2d 960 (Fla.1987) (holding that neither the trial court nor counsel is required to advise a defendant of the collateral consequences of a plea).[3] Due process requires that a trial court advise the defendant of the direct consequences of the plea prior to accepting it. Similarly, in order to be constitutionally effective, counsel must advise a defendant of the direct consequences of the plea.
The issue thus becomes whether commitment under the Act is a direct or collateral consequence of a plea to a qualifying offense. In Ginebra, the supreme court defined direct consequences to include "only those consequences of the sentence which the court can impose." Id. at 961. Applying this definition, we would be constrained to conclude that commitment is a collateral rather than direct consequence. See id. (holding that deportation is not a direct consequence because the trial court has no authority concerning deportation). We however have certain misgivings about the continued validity of this definition in light of the supreme court's decision in Ashley v. State, 614 So.2d 486 (Fla.1993), in which the court held that a defendant must be advised of the reasonable consequences of habitualization, including its effect on gain time and other early release eligibility.[4]
*9 We conclude that the broader definition of direct consequences followed by the federal courts and adopted by the Fourth District is more consistent with the result reached in Ashley.
`The distinction between `direct' and `collateral' consequences of a plea, while sometimes shaded in the relevant decisions, turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment.' Cuthrell v. Director, Patuxent Institution, 475 F.2d 1364, 1366 (4th Cir.) cert. denied, 414 U.S. 1005, 94 S.Ct. 362, 38 L.Ed.2d 241 (1973).
Daniels v. State, 716 So.2d 827, 828 (Fla. 4th DCA 1998).
We now apply that broader definition to the consequences faced by Mr. Watrous in this case to determine whether they are a direct or a collateral result of his plea. In order to commit someone under the Act, the State must prove by clear and convincing evidence that the person (1) has been convicted of a sexually violent offense and (2) suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for longterm control, care, and treatment. See §§ 394.912(10), 394.917. Thus, a conviction for a qualifying offense provides one of the necessary elements for commitment. See § 394.912.
In order to determine whether a person meets the second element, a multidisciplinary team performs an assessment of that person which includes a review of *10 his or her records and a personal interview. This assessment is automatically triggered as result of a conviction for a qualifying offense. See § 394.913(1) (providing that the agency with jurisdiction over a person who has been convicted of a qualifying offense shall notify the multidisciplinary team and state attorney one year before that person's anticipated release); § 394.913(3) (providing that the multidisciplinary team shall assess and evaluate each person referred to the team). Although the assessment itself is automatically triggered, whether or not the multidisciplinary team recommends commitment will depend upon an evaluation of the person's current mental state to determine whether he or she is likely to engage in acts of sexual violence if not confined. See §§ 394.913(3), 394.912(10). A recommendation to file a petition does not, therefore, flow automatically from the prior conviction.
Moreover, even if commitment is recommended, this does not automatically result in either the filing of a petition or actual commitment. Once a person has been evaluated, the state attorney has discretion whether to seek commitment. See § 394.914.[5] If the state attorney decides to pursue involuntary commitment, the person is entitled to a jury trial in which the State must prove by clear and convincing evidence that he or she is a sexually violent predator. See § 394.917. Thus, although a plea to a qualifying offense automatically puts a person at risk for commitment, it does not automatically result in that person's commitment.[6] We conclude therefore that commitment under the Act is a collateral consequence of a plea. See Pearman v. State, 764 So.2d 739 (Fla. 4th DCA 2000).
Other state and federal courts have reached the same conclusion with regard to similar statutes allowing for the civil commitment of sexual predators. See, e.g., George v. Black, 732 F.2d 108 (8th Cir. 1984); Martin v. Reinstein, 195 Ariz. 293, 987 P.2d 779 (App.1999); People v. Moore, 69 Cal.App.4th 626, 81 Cal.Rptr.2d 658 (1999); In re Care & Treatment of Hay, 263 Kan. 822, 953 P.2d 666 (1998); In re Detention of Campbell, 139 Wash.2d 341, 986 P.2d 771 (1999); State v. Zanelli, 212 Wis.2d 358, 569 N.W.2d 301 (App.1997).
We are compelled to also conclude that the failure of the trial court or counsel to advise a defendant of this collateral consequence does not render the plea involuntary and does not provide a basis on which to withdraw the plea. See Ginebra, 511 So.2d 960; Pearman, 764 So.2d 739. We would note, however, that based on the severity of consequences under the Act, the better course of action would be for both the trial court and counsel to advise all defendants who could be affected by the Act of that possibility.[7] We would also urge the supreme court to follow the *11 course of action that it took after Ginebra and amend rule 3.172 to require trial courts to advise defendants of the consequences of the Act.
We now turn to Mr. Watrous's second claim that counsel affirmatively misadvised him that he would be released from custody almost immediately after pleading. Assuming that our above conclusion is correct that the effects of the Act are collateral consequences of which a defendant need not be advised, we nonetheless must reverse. It is well-settled that affirmative misadvice regarding even collateral consequences of a plea forms a basis for withdrawing the plea. See Simmons v. State, 611 So.2d 1250 (Fla. 2d DCA 1992) (holding that defendant was entitled to withdraw plea if affirmatively misadvised about the possible effect on gain time although that was considered to be a collateral consequence of the plea); Ray v. State, 480 So.2d 228 (Fla. 2d DCA 1985) (holding that defendant who is affirmatively misled about his eligibility for gain time and its impact on the length of his sentence is entitled to withdraw his plea); Montgomery v. State, 615 So.2d 226 (Fla. 5th DCA 1993).
If, as Mr. Watrous claims, he pleaded in reliance upon his counsel's assertion that he would be released shortly after the plea and sentencing hearing, and this has not in fact happened, then Mr. Watrous would be entitled to withdraw his plea on this basis as well. We recognize that in so advising Mr. Watrous, counsel likely meant that Mr. Watrous would be released from the custody of the Department of Corrections. However, because a civil commitment petition was filed against him pursuant to the Act, Mr. Watrous was never released from custody but merely transferred from the Department of Corrections to the Department of Children and Families to be held in secure detention. See § 394.915(1) (providing that once a commitment petition is filed and a finding of probable cause made, the respondent shall "remain in custody and be immediately transferred to an appropriate secure facility").
Mr. Watrous alleged that he pleaded with the understanding that he would be released from custody almost immediately. The crucial issue in determining whether Mr. Watrous was misadvised is not which state agency currently has custody of him but whether he was in fact released from state custody. If, as appears, Mr. Watrous was not released but merely transferred from prison to a secure treatment facility, then he was not released from custody and his attorney's statement that he would be was erroneous. If, in fact, Mr. Watrous relied on this affirmative misadvice, then his plea was involuntary and he must be allowed to withdraw it.
We therefore reverse and remand for an evidentiary hearing as to this claim.
Affirmed in part; reversed in part; and remanded.
THREADGILL, A.C.J., and DAVIS, J., concur.
BLUE, J., concurs in part, dissents in part with opinion.
BLUE, Judge, Concurring in part; dissenting in part.
I fully concur in the majority's conclusion that Mr. Watrous has stated a facially sufficient claim that he was affirmatively misadvised of the consequences of his plea and is entitled to an evidentiary hearing on this basis. I would, however, also find that counsel's failure to advise him of the possibility of involuntary civil commitment under the Act constituted ineffective assistance of counsel and rendered the plea involuntary. I would therefore reverse *12 and remand on this claim for an evidentiary hearing as well.
I first note that the facts of this case are extremely troubling. At the time that Mr. Watrous pleaded, the Act had been in effect for over six months. The offenses to which he pleaded are listed in the Act as qualifying offenses. I believe competent counsel should have known of the existence of the Act and that it would apply to Mr. Watrous. According to Mr. Watrous, however, counsel did not advise him of the Act, and he was therefore unable to consider it in making a decision whether to accept the apparently generous negotiated plea offered by the State. Although Mr. Watrous was sentenced to thirty years' prison when he was originally convicted after trial, the State offered him a sentence of only ten years' prison in exchange for his plea-presumably with a full understanding that that sentence would be almost expired based on the time he had already served. Then, less than a month after Mr. Watrous pleaded, the State filed a commitment petition against him.
It appears that Mr. Watrous immediately contacted new counsel and sought to withdraw his plea. Counsel responded by filing a motion to withdraw plea on July 30,1999, which was untimely as a motion to withdraw plea pursuant to rule 3.170(l) and facially insufficient as a motion pursuant to rule 3.850. Had Mr. Watrous timely filed a motion to withdraw plea pursuant to rule 3.170(l), he would almost certainly have been entitled to withdraw his plea. See State v. Stapleton, 764 So.2d 886 (Fla. 4th DCA 2000); Simmons, 611 So.2d 1250 (noting that a defendant attempting to withdraw a plea pursuant to rule 3.850 has a greater burden then one seeking to withdraw a plea under rule 3.170). Unfortunately for Mr. Watrous, either because he did not act quickly enough or because counsel did not act quickly enough, he is now limited to collateral relief pursuant to rule 3.850.
I am disturbed by the specific facts of this case for two reasons. First, because Mr. Watrous moved to withdraw his plea so quickly, it is extremely unlikely that the State would be prejudiced by allowing him to withdraw his plea, although he has been severely prejudiced by the trial court's refusal to allow him to withdraw it. Second, and more importantly, the fact that the State offered Mr. Watrous a sentence that was one-third the length of the sentence he received after trial and which would have resulted in his immediate release, coupled with the fact that the same state attorney's office filed a commitment petition against him only twenty-five days later, gives the appearance that the State is using the Act to extend Mr. Watrous' punishment after agreeing to an inappropriately lenient sentence.
Our supreme court has held that in order for a plea to be knowing and intelligent the defendant must understand the reasonable consequences of the plea including the maximum penalty to be imposed. See Ashley, 614 So.2d at 488. Assuming that the majority is correct that this only includes the direct consequences of the plea, I nonetheless believe that the consequences faced by a defendant pleading to a qualifying offense are sufficiently direct to require that he or she be warned of them. I also conclude however that a sense of justice and fair play render a strict application of the rule regarding collateral consequences inappropriate to a sanction as severe as the one faced in this case.
I conclude that exposure to screening under the Act and the accompanying infringement of liberty (regardless of whether the defendant is ultimately committed under the Act) is itself sufficiently automatic and punitive to constitute a direct *13 consequence of a plea of which the defendant should be informed. As acknowledged by the majority, a plea to a qualifying offense automatically subjects a person to an assessment by the multidisciplinary team. If the State fails to have a person who has been convicted of a qualifying offense assessed before his or her release date, then rather than releasing the person, the agency with jurisdiction over that person must transfer him or her to a secure facility operated by the Department of Children and Families. See § 394.9135. There is no procedure contained in the Act by which the person may contest this transfer. The person is then held in that facility for up to five days (or longer if there are intervening weekends) in order to allow the multidisciplinary team to perform its assessment and for the state attorney to make a decision whether to file a commitment petition and to obtain an ex parte probable cause order directing the person's continued confinement. See § 394.9135. This alone constitutes an automatic extension of the person's confinement.
If the state attorney decides to file a commitment petition, the court then makes an ex parte probable cause determination based on the same documents considered by the state attorney (i.e., the multidisciplinary team's report and the psychiatric evaluations).[8] Under the provisions of the Act, once a court has made an ex parte determination that probable cause exists, the person must be detained in a secure facility pending trial. In some cases, persons have been held for a year or more while awaiting their commitment trial. See, e.g., Sjuts v. State, 754 So.2d 781 (Fla. 2d DCA 2000) (noting that as of the writing of the opinion, Sjuts had been detained over a year awaiting his civil commitment trial). I would conclude that the loss of freedom associated with these procedures is a definite, immediate, and largely automatic effect of a plea to a qualifying offense.
I would also conclude that this loss of freedom is sufficiently punitive in nature that a defendant must be warned of it prior to entering a plea. There is nothing remedial in nature about the automatic pre-trial confinement. Although the Act specifically provides that persons determined after trial to be sexually violent predators are to be committed to the Department of Children and Families for "control, care, and treatment," § 394.917, nothing in the Act provides for any treatment for persons detained and awaiting trial.
I would therefore hold that the risk of commitment under the Act and the effects of the procedures provided for by the Act to evaluate and then bring to trial a person alleged to be a sexual predator are direct consequences of a plea to a qualifying offense of which a person pleading to such offense must be informed. I would further hold that failure to advise a defendant of these consequences entitles that person to withdraw his or her plea.
Having reached that conclusion, I also believe that a strict, formulaic application of the general principle that a defendant need only be advised of the direct consequences of a plea does not serve justice in this instance. As a practical matter, I do not believe that any defendant who pleaded guilty to a qualifying offense without being told that it could subject him or her to possible lifetime civil commitment would *14 consider that plea voluntary, knowing or intelligent. The severity of the consequence alone, even if the risk of it actually occurring was low, would play a significant factor in any intelligent decision whether to accept a negotiated plea. Moreover, I have serious doubts that a person convicted of any qualifying offense, let alone the three qualifying offenses involving children to which Mr. Watrous pleaded, faces only a low risk of commitment under the Act. Although I am unaware of any empirical data on the percentage of persons committed under Florida's Act, I would expect it to be relatively high given the public's (justifiable) fear and outrage at persons who have committed sexually violent offenses.
As the majority acknowledges in footnote four, there is some support in Florida law for the proposition that certain collateral consequences are of such a nature that a defendant must be advised of them in order for his or her plea to be voluntary. See Freels v. State, 701 So.2d 1207, 1209 (Fla. 1st DCA 1997); State v. Will 645 So.2d 91, 95 (Fla. 3d DCA 1994). Prior to Ginebra, the Third District held that although deportation was a collateral consequence, it was such a severe consequence that counsel nonetheless was required to warn a defendant of it in order to be constitutionally effective. See Edwards v. State, 393 So.2d 597 (Fla. 3d DCA 1981), disapproved by State v. Ginebra, 511 So.2d 960 (Fla.1987). Although the supreme court rejected this argument in Ginebra, I believe that it applies with even more force here. While deportation may amount to a "life sentence of exile," Edwards, 393 So.2d at 598, for many, commitment under the Act will amount to a life sentence.
I also believe, despite its label as a civil commitment statute for the "care, control, and treatment" of sexually violent predators, that the Act is nothing more than a way for the legislature to indefinitely extend the involuntary confinement and punishment of persons convicted of sexually motivated violent crimes. While I share the public's outrage at the crimes committed by persons subject to the Act, I cannot condone the solution offered by the legislature. I join Judge Harris, for the reasons articulated by him in his concurring opinion in State v. Brewer, 767 So.2d 1249 (Fla. 5th DCA 2000), in concluding that the Act unconstitutionally allows the State to extend the punishment of certain convicted sexual offenders and in effect to punish them for crimes they might commit in the future. So long as the Act is in effect, at a bare minimum courts and defense attorneys should be required to warn defendants of its possible application to them.
For these reasons, I would hold that a defendant who is not advised of the possibility of civil commitment must be allowed to withdraw his plea. Given the severity of the consequences under the Act and the questionable state of the law since Ashley and its progeny, I do not believe that Ginebra compels a contrary result. I cannot agree with the majority's apparent conclusion that the constitution never requires that the trial court or counsel inform a defendant of the collateral consequences of a plea. I would find at a minimum that in order to be constitutionally effective, counsel must advise a client who is pleading to a qualifying offense that he or she faces possible lifetime civil commitment as a result.
I would therefore reverse and remand the order denying Mr. Watrous' motion on this claim for an evidentiary hearing to determine whether Mr. Watrous was advised of these consequences. If, in fact, Mr. Watrous was not advised of the possibility of detention beyond the expiration of his prison sentence and commitment under the Act, he should be allowed to withdraw *15 his plea. Given the contrary result reached by the majority on this issue, however, I join in their suggestion to the supreme court to amend rule 3.172 to specifically require trial courts to advise defendants pleading to qualifying offenses that their pleas may subject them to indefinite civil commitment.
NOTES
[1] Mr. Watrous was originally convicted after trial in 1994, and sentenced to thirty years' prison. In 1999, the trial court granted a prior motion for postconviction relief directed at errors committed during the 1994 trial and vacated the convictions. Mr. Watrous has been in prison since his conviction and sentencing in 1994.
[2] Mr. Watrous, through the same counsel, first filed a motion entitled "motion to withdraw plea" on July 30, 1999, and an "amended motion to withdraw plea" on September 17, 1999. Those motions were apparently considered on their merits and denied on November 16, 1999. No appeal was taken. Neither motion was timely as a motion to withdraw plea pursuant to Florida Rule of Criminal Procedure 3.170(l) or facially sufficient as a postconviction motion pursuant to Florida Rule of Criminal Procedure 3.850. The motions should therefore have been dismissed and would not operate as a procedural bar to the current motion. See Daniels v. State, 685 So.2d 1344 (Fla. 2d DCA 1996).
[3] Subsequent to its decision in State v. Ginebra, 511 So.2d 960 (Fla.1987), the supreme court amended Florida Rule of Criminal Procedure 3.172 to require that all defendants be advised prior to pleading that as a result of the plea they could face deportation if not a U.S. citizen.
[4] In Ashley v. State, 614 So.2d 486 (Fla.1993), the supreme court addressed the necessary requirements that must be met before imposing a habitual sentence after a plea. The court concluded that, in order for a plea which subjects a defendant to a habitual sentence to be knowing and voluntary, the defendant must be aware of the possibility and reasonable consequences of habitualization including its impact on certain early release programs. See id. at 490. Prior to Ashley, it was generally understood that issues concerning eligibility for gain time were collateral consequences of a plea of which the defendant did not need to be informed. Freels v. State, 701 So.2d 1207 (Fla. 1st DCA 1997)(noting that prior to Ashley, gain time consequences were generally considered to be collateral); State v. Will, 645 So.2d 91 (Fla. 3d DCA 1994) (holding that before Ashley, gain time ineligibility was a collateral consequence); Simmons v. State, 611 So.2d 1250 (Fla. 2d DCA 1992); Blackshear v. State, 455 So.2d 555 (Fla. 1st DCA 1984); Zambuto v. State, 413 So.2d 461 (Fla. 4th DCA 1982).

In Ashley, the court did not explicitly state whether its holding was based on a conclusion that the effects of habitualization on gain time were direct consequences or whether they were collateral consequences that were serious enough to warrant special treatment. The Fifth District has interpreted Ashley as supporting that court's prior conclusion that the effect of habitualization on gain time eligibility is a direct consequence of a plea. See Wilcox v. State, 638 So.2d 527 (Fla. 5th DCA 1994). The First District has concluded that Ashley "transformed" gain time and early release to equal footing with direct consequences. Freels, 701 So.2d at 1209. The Third District seems to construe Ashley as holding that loss of gain time is still a collateral consequence, but one of which the trial court is now required to advise defendants. See Will, 645 So.2d at 95.
We conclude that the better reading of Ashley is that ineligibility for certain gain time is a direct consequence of a plea as a habitual offender. While it is inconsistent with the Ginebra definition of direct consequence, it is consistent with a slightly broader definition followed by federal courts and adopted by the Fourth District, which provides that those consequences that have a definite, immediate, and largely automatic effect on the range of punishment are direct consequences of a plea. See Daniels v. State, 716 So.2d 827, 828 (Fla. 4th DCA 1998). When Ashley was decided, ineligibility for gain time was a direct and automatic result of being convicted as a habitual offender. See § 775.084, Fla. Stat. (1989) (providing that persons convicted as habitual offenders are not entitled to basic gain time). We thus conclude that in Ashley, the supreme court has implicitly expanded the definition of direct consequences from the one used by the court in Ginebra.
[5] The statute would appear to require receipt of the written assessment and recommendation as a condition precedent to the filing of a commitment petition but does not appear to require that the multidisciplinary team recommend commitment in order for the state attorney to seek commitment.
[6] Because we conclude that commitment under the Act does not flow automatically from a plea to a qualifying offense, we do not address whether confinement under the Act affects a defendant's range of punishment.
[7] In fact the Fourth District has denied certiorari review where a trial court allowed a defendant to withdraw his plea pursuant to Florida Rule of Criminal Procedure 3.172 because he was not informed of the possibility of involuntary commitment under the Act, stating that "we agree ... with its [the trial court's] conclusion that Stapleton should have been advised of the known consequences of his plea." State v. Stapleton, 764 So.2d 886, 888 (Fla. 4th DCA 2000).
[8] As a practical matter, it appears that the multidisciplinary team's recommendation and the psychiatric evaluations and conclusions regarding future dangerousness are often based entirely on the factual allegations associated with the person's prior crime rather than any meaningful evaluation of the person's current mental state.